

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

TERESA REED-JENNINGS and CLIFF JENNINGS, wife and husband and their marital community,

Appellants,

v.

THE BASEBALL CLUB OF SEATTLE, L.P., a Washington corporation, d/b/a The Seattle Mariners, WASHINGTON STATE MAJOR LEAGUE BASEBALL STADIUM PUBLIC FACILITIES DISTRICT, a municipal corporation; Defendants John Doe I-X,

Respondents.

No. 71545-3-I

UNPUBLISHED OPINION

FILED: May 26, 2015

VERELLEN, A.C.J. — During batting practice before a Seattle Mariners baseball game, a batter hit a foul ball into the stands along the right field foul line, seriously injuring Teresa Reed-Jennings. The trial court properly dismissed the Jennings' negligence claim against the Mariners because the Mariners did not breach its limited duty of care, and, alternatively, assumption of risk bars any recovery. We affirm.

## FACTS

The material facts are undisputed. The Jennings attended a Mariners game at Safeco Field on May 4, 2009, and arrived more than an hour before the game to watch

batting practice.[1] They sat along the right field foul line, two rows up from the field in section 116.

The Jennings' ticket included a warning that explained the dangers of balls and bats entering the stands. Cliff Jennings, Teresa's husband, read the warning, but Teresa did not. On the concourse above section 116, several support posts for the lower level warned spectators about bats and balls leaving the playing field. Near the Jennings' seats on the wall separating the seats from the field, additional warnings cautioned spectators about bats or balls leaving the field. The back of each seat in section 116 warned spectators about "bats and balls leaving the field."[2] Teresa maintains she did not see any of these warnings but "knew that balls could come into the stands" during batting practice.[3]

Safeco Field has a permanent 26-foot safety screen behind home plate. For batting practice, the Mariners place a batting cage above and around three sides of home plate and temporary safety screens at first base, second base, center field, and the pitcher's mound. Since 2002, the Mariners have placed 8- by 10-foot temporary safety screens along the left field and right field foul lines. Major League Baseball (MLB) did not require teams to have temporary safety screens along the foul lines until 2012.

From 2005 to May 2009, over 10,000,000 spectators attended a Mariners baseball game. Of those 10,000,000, 300 spectators have been hit by either fair or foul balls. Of those 300, only 5 spectators were injured while sitting in section 116.

---

[1] We use the parties' first names for ease of reference.

[2] Clerk's Papers (CP) at 111.

[3] CP at 280, ¶ 6.

Batting practice affords spectators more protection because the Mariners remove the batting cage and other temporary safety screens once the game starts. Teresa was aware that a safety screen did not extend all the way down the first base line to protect her from all foul balls.

The visiting team performs batting practice after the Mariners. The pitcher "typically hold[s] three balls in his non-pitching hand and one ball in his pitching hand" to reduce "delay between pitches."[4] The pitcher "must throw in a rhythm during batting practice so that players and coaches can get the maximum work done and are not unduly exposed to danger."[5] Batting practice runs rapidly and consists of "many activities occurring at the same time."[6] Pitchers do not wait long between pitches, so batters can get the proper number of swings. Every other MLB team conducts batting practice in a similar fashion. Before May 4, 2009, Teresa had never attended or seen batting practice.

The Jennings previously attended several baseball games at Safeco Field and, on those occasions, sat near or in section 116. The Jennings recalled seeing foul balls land in the stands on previous occasions. The Jennings knew foul balls could reach their area. But Teresa did not know "multiple balls could be batted into the air simultaneously during batting practice."[7]

On May 4, 2009, Teresa saw a foul ball land near her seat during batting practice. Shortly after, a batter hit a ball into center field, and Teresa attempted to track

---

[4] CP at 135, ¶ 6.

[5] CP at 135 ¶ 8.

[6] CP at 136, ¶ 9.

[7] CP at 280, ¶ 7.

the ball's flight. Before that ball was caught, Teresa heard another ball being hit. When she turned her head, the second ball hit her in the face. Teresa sustained serious injuries to her left eye. She twice tweeted several days after the game: "A foul ball landed in the seats in front of us and the young man next to Cliff scampered over the seats and grabbed it,"[8] and "I said, well, that really should have been my ball. I just wasn't fast enough. I said I wanted another one to land right there. It'[ll] be mine."[9]

The Jennings sued the Mariners, alleging negligence.

The Mariners moved for summary judgment, arguing it satisfied its limited duty to protect spectators from foul balls by placing several temporary safety screens on the field and a permanent 26-foot safety screen behind home plate. The Mariners also argued Teresa assumed the risk of her injury because "she knew batting practice was ongoing" and "a foul ball had landed in her seating area earlier."[10]

The Jennings argued the adoption of comparative fault statutes abrogated the limited duty rule. They also argued the implied primary assumption of risk doctrine does not bar their recovery because the Mariners breached its duty to exercise reasonable care under *Restatement (Second) of Torts* § 343 (1965).

The trial court granted the Mariners summary judgment. The trial court determined the Mariners did not breach a duty owed to the Jennings, and, even if the Mariners did breach a duty, the Jennings assumed the risk of injury.

The Jennings appeal.

---

[8] CP at 113.

[9] CP at 114.

[10] CP at 11.

ANALYSIS

The Jennings challenge the trial court's summary judgment dismissing their negligence claim. They specifically argue genuine issues of material fact exist as to whether the Mariners breached its duty of care and whether Teresa assumed the risk posed by multiple batted balls being simultaneously in play during batting practice.

We review a summary judgment order de novo, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party.[11] Summary judgment is proper if no genuine issues of material fact exist and "reasonable persons could reach but one conclusion."[12] "A material fact is one that affects the outcome of the litigation."[13]

*Limited Duty Rule*

Contrary to the Jennings' contention, Washington follows the limited duty rule. For many decades throughout the United States, the majority of jurisdictions have applied the limited duty rule to define the duty a baseball stadium operator owes to its patrons injured from foul balls before or during a game.[14] The limited duty rule requires

---

[11] Fulton v. State, Dep't of Soc. & Health Servs., 169 Wn. App. 137, 147, 279 P.3d 500 (2012).

[12] Vallandigham v. Clover Park Sch. Dist., 154 Wn.2d 16, 26, 109 P.3d 805 (2005).

[13] Wm. Dickson Co. v. Pierce County, 128 Wn. App. 488, 492, 494, 116 P.3d 409 (2005).

[14] A partial list of other jurisdictions that have applied the limited duty rule under similar circumstances includes: Turner v. Mandalay Sports Entm't, LLC, 124 Nev. 213, 217-19, 180 P.3d 1172 (2008) (adopting the limited duty rule where an in-game foul ball hit the plaintiff as she sat in the stadium's beer garden); Lawson ex rel. Lawson v. Salt Lake Trappers, Inc., 901 P.2d 1013, 1015 (Utah 1995) (applying the limited duty rule where an in-game foul ball struck plaintiff as he sat at his seat); Arnold v. City of Cedar Rapids, 443 N.W.2d 332, 333 (Iowa 1989) ("[A baseball stadium operator] fully discharges any obligation to protect spectators from thrown or hit balls by providing seating in a fully protected area."); Akins v. Glen Falls City Sch. Dist., 53 N.Y.2d 325,

5

baseball stadium operators "to screen some seats . . . to provide protection to spectators who choose it."[15] This rule imposes two requirements on baseball stadium operators. First, baseball stadium operators must provide a sufficient number of protected seating for those spectators "'who may be reasonably anticipated to desire protected seats on an ordinary occasion.'"[16] Second, baseball stadium operators must "provide protection for all spectators located in the most dangerous parts of the stadium, that is, those areas that pose an unduly high risk of injury from foul balls (such as directly behind home plate)."[17]

Washington courts have long imposed a limited duty on baseball stadium operators to screen some seats, generally those behind home plate.[18]

---

329-30, 441 N.Y.S.2d 644, 424 N.E.2d 531 (1981); Erickson v. Lexington Baseball Club, 233 N.C. 627, 628-29, 65 S.E.2d 140 (1951); Anderson v. Kansas City Baseball Club, 231 S.W.2d 170, 172-73 (Mo. 1950); Brisson v. Minneapolis Baseball & Athletic Ass'n, 185 Minn. 507, 508-09, 240 N.W. 903 (1932); Wade-Keszey v. Town of Niskayuna, 4 A.D.3d 732, 733-35, 772 N.Y.S.2d 401 (2004); Benejam v. Detroit Tigers, Inc., 246 Mich. App. 645, 635 N.W.2d 219, 225 (2001) ("[A baseball stadium operator] that provides screening behind home plate sufficient to meet ordinary demand for protected seating has fulfilled its duty with respect to screening and cannot be subjected to liability for injuries resulting to a spectator by an object leaving the playing field."); Bellezzo v. State, 174 Ariz. 548, 554, 851 P.2d 847 (1992); Crane v. Kansas City Baseball & Exhibition Co., 168 Mo. App. 301, 153 S.W. 1076 (1913); see generally James L. Rigelhaupt, Jr., Annotation, Liability to Spectator at Baseball Game Who is Hit by Ball or Injured as Result of Other Hazards of Game, 91 A.L.R.3d 24 (1979).

[15] Taylor v. Baseball Club of Seattle, L.P., 132 Wn. App. 32, 37, 130 P.3d 835 (2006).

[16] Turner, 124 Nev. at 217-18 (quoting Schneider v. Am. Hockey, 342 N.J. Super. 527, 533-34, 777 A.2d 380 (2001).

[17] Id. at 218.

[18] Taylor, 132 Wn. App. at 37; Leek v. Tacoma Baseball Club, Inc., 38 Wn.2d 362, 364, 229 P.2d 329 (1951) ("[A baseball stadium operator's] duty is fulfilled when screened seats are provided for as many as may reasonably be expected to call for them on any ordinary occasion."); Kavafian v. Seattle Baseball Club Ass'n, 105 Wash. 215, 181 P. 679 (1919).

The Mariners clearly satisfied its limited duty to screen a reasonable number of seats. Safeco Field has a permanent 26-foot safety screen behind home plate. The Mariners' head groundskeeper Bob Christofferson testified that he and his crew place temporary safety screens on the field during batting practice, including a batting cage above and around three sides of home plate and temporary safety screens at first base, second base, center field, and the pitcher's mound. As previously noted, since 2002, the Mariners have placed 8- by 10-foot temporary safety screens along the left field and right field foul lines. MLB did not require teams to have temporary safety screens along the foul lines until 2012. Christofferson placed the temporary safety screens along the foul lines "to reduce the number of line drive foul balls reaching the spectator seats."[19] No evidence in the record suggests the Mariners' screening of certain sections of the stadium deviated from the screening customarily employed at other MLB stadiums.

The record reveals a very low risk of injury in section 116 from foul balls. For example, the Mariners' Vice President of Ballpark Operations Scott Jenkins testified that from 2005 to May 2009, over 10,000,000 patrons attended a Mariners game at Safeco Field. During that period, for both games and batting practice, "300 people had some form of injury or contact with a ball that left the playing field."[20] Of those 300 incidents, only 5 occurred in section 116 where Teresa was injured. Nothing in the record indicates "foul balls of this kind cause serious injuries with sufficient frequency to be considered an unreasonable risk."[21] Similar to throwing balls pregame ("long toss") in Taylor v. Baseball Club of Seattle, L.P., batting practice is a normal part of pregame

---

[19] CP at 366, ¶ 8.

[20] CP at 74.

[21] Leek, 38 Wn.2d at 366; Taylor, 132 Wn. App. at 41 ("The fact that no one has been injured simply shows that long toss does not pose an unreasonable risk.").

warm-ups.[22] No evidence suggests the batting practice here did not conform to MLB custom.

The Jennings cite Leek v. Tacoma Baseball Club for the proposition that Washington applies *Restatement (Second) of Torts* § 343 to define a baseball stadium operator's duty of care.[23] But Leek only discussed the restatement in pronouncing its holding that the limited duty rule applies. No Washington courts have cited § 343 in the baseball context since Leek. And no Washington courts, including Leek, have applied § 343 in the baseball context.

Additionally, the Jennings cite Rountree v. Boise Baseball LLC, a 2013 Idaho Supreme Court decision rejecting the limited duty standard.[24] Rountree is not compelling. Rountree involved a different factual scenario, rejected the limited duty rule, and determined "primary implied assumption of the risk is not a valid defense" in Idaho.[25] Because Washington applies the limited duty rule and accepts primary implied assumption of the risk as a valid defense,[26] we decline to follow Roundtree.

The Jennings also contend that, to the extent Kavafian v. Seattle Baseball Club Association[27] and Leek previously recognized the limited duty rule, subsequent comparative fault statutes have impliedly overruled it. But the Jennings cite no

---

[22] 132 Wn. App. 32, 37, 130 P.3d 835 (2006).

[23] 38 Wn.2d 362, 229 P.2d 329 (1951).

[24] 154 Idaho 167, 296 P.3d 373 (2013).

[25] Id. at 174.

[26] Scott ex rel. Scott v. Pac. W. Mountain Resort, 119 Wn.2d 484, 495, 834 P.2d 6 (1992) ("Primary implied assumption of risk continues as a complete bar to recovery [even] after the adoption of comparative negligence laws.").

[27] 105 Wash. 215, 181 P. 679 (1919).

compelling authority for this proposition. The Jennings demonstrate nothing about comparative fault that precludes the continued viability of the limited duty rule.

Therefore, because the Mariners satisfied its duty of screening a reasonable number of seats, the Jennings chose not to sit in those screened seats, and the seats they chose did not pose an unduly high risk of injury from foul balls, they fail to demonstrate any breach of duty regarding injury from a foul ball in section 116 during batting practice. The trial court properly applied the limited duty rule to grant the Mariners summary judgment dismissing the Jennings' negligence claim.

*Implied Primary Assumption of Risk*

Even if the limited duty rule did not apply here, the defense of implied primary assumption of risk would preclude any recovery. The interplay between a landowner's general duty of care and a plaintiff's assumption of risk is nuanced. The "'boundaries of the defendant's duty to act do not . . . coincide in all cases with those of the plaintiff's assumption of risk.'"[28]

> The duty is determined upon the basis of what the defendant should expect, while assumption of risk is a matter of what the plaintiff knows, understands, and is willing to accept. Thus one who supplies a defective chattel for the use of another may be under a duty to make it safe, to warn the other of the defect, or otherwise to protect him, because it may be expected that he will not discover the defect. When the other does discover it, and nevertheless proceeds quite voluntarily to make use of the chattel, he assumes the risk.[29]

Even assuming that a general landowner's duty applies, the boundaries of the landowner's duty do not coincide in all cases with the defense of implied primary assumption of the risk.

---

[28] Hvolboll v. Wolff Co., No. 31836-2-III, 2015 WL 1573274, at *6 (Wash. Ct. App. Feb. 12, 2015) (quoting RESTATEMENT (SECOND) OF TORTS § 496C cmt. e (1965)).

[29] RESTATEMENT (SECOND) OF TORTS § 496C cmt. e.

Teresa argues she did not fully subjectively understand the specific risk that she could be hit and injured by a foul ball sitting in an unscreened seat during batting practice when multiple batted balls are simultaneously in play. She contends she did not voluntarily choose to encounter that specific risk. We disagree.

Washington recognizes "'four categories of assumption of risk: (1) express, (2) implied primary, (3) implied reasonable, and (4) implied unreasonable.'"[30] Implied primary assumption of risk "occurs when the plaintiff has impliedly consented to assume a duty."[31] "Since implied primary assumption of the risk negates duty," it bars recovery "when the injury results from one of the risks assumed."[32] Assumption of the risk limits recovery but only to the extent the plaintiff's damages resulted from the specific risks known to and appreciated by the plaintiff and voluntarily encountered.[33]

To establish the implied primary assumption of risk defense, the defendant must show the plaintiff fully subjectively understood the specific risk's nature and presence, and he or she voluntarily chose to encounter the risk.[34] In other words, the spectator "*knowingly* and *voluntarily* chose to encounter the risk."[35] [36] "If reasonable minds could

---

[30] Hvolboll, 2015 WL 1573274, at *5 (quoting 16 DAVID K. DEWOLF & KELLER, W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE 9:11, at 398 (4th ed. 2013)); Scott, 119 Wn.2d at 496.

[31] Scott, 119 Wn.2d at 497.

[32] Id. at 498 (emphasis omitted).

[33] Id. at 496; Kirk v. Wash. State Univ., 109 Wn.2d 448, 454-55, 746 P.2d 285 (1987).

[34] Taylor, 132 Wn. App. at 38; Kirk, 109 Wn.2d at 453.

[35] Jessee v. City Council of Dayton, 173 Wn. App. 410, 414, 293 P.3d 1290 (2013) (emphasis added).

[36] The comments to the restatement provide an apt illustration: "A, the owner of a baseball park, is under a duty to the entering public to provide a reasonably sufficient number of screened seats to protect those who desire it against the risk of being hit by batted balls. A fails to do so. B, a customer entering the park, is unable to find a

10

not differ on the knowledge and voluntariness, there is implied primary assumption of the risk as a matter of law."[37]

Implied primary assumption of risk generally applies a subjective standard.[38] In particular, the test for knowledge is subjective, but the facts that should be known are objectively determined. A plaintiff has knowledge if, "at the time of decision, [he or she] *actually and subjectively* knew all facts that a reasonable person . . . in the plaintiff's shoes would want to know and consider."[39] A plaintiff "must be aware of more than just the generalized risk of their activities; there must be proof [he or she] knew of and appreciated the specific hazard which caused the injury."[40]

"Whether a plaintiff decides *voluntarily* to encounter a risk depends on whether he or she elects to encounter it despite knowing of a reasonable alternative course of action."[41] The plaintiff "'must have had a reasonable opportunity to act differently or proceed on an alternate course that would have avoided the danger.'"[42]

Teresa claims she did not appreciate the specific risk posed by multiple batted balls simultaneously in play during batting practice. But the required knowledge is of a particular type of risk, not knowledge of every variable that might affect the likelihood or exact mechanism of harm. Simpson v. May explains:

---

screened seat, and although fully aware of the risk, sits in an unscreened seat. B is struck and injured by a batted ball. Although A has violated his duty to B, B may be barred from recovery by his assumption of the risk." RESTATEMENT (SECOND) OF TORTS § 496C cmt. g(4).

[37] Jessee, 173 Wn. App. at 414.

[38] Taylor, 132 Wn. App. at 38.

[39] Home v. N. Kitsap Sch. Dist., 92 Wn. App. 709, 720, 965 P.2d 1112 (1998).

[40] Shorter v. Drury, 103 Wn.2d 645, 657, 695 P.2d 116 (1985).

[41] Home, 92 Wn. App. at 721.

[42] Id. (quoting Zook v. Baier, 9 Wn. App. 708, 716, 514 P.2d 923 (1973)).

> To illustrate, one who attends a baseball game may be precluded from recovering for damages suffered when hit by a ball or broken bat. This preclusion may apply *even if the circumstances leading to the injury were somewhat bizarre.* He [or she] would not be precluded from recovering for damages from a collapsing grandstand or from eating tainted concession food unless he [or she] knew of this specific risk and voluntarily accepted these risks.[43]

The particular risk faced in attending batting practice at a Mariners game at Safeco Field is the occasional risk of an errant throw or foul ball or bat entering the stands.

The record here supports that Teresa had a full subjective understanding of the specific risk, both its nature and presence, that a foul ball could be hit into section 116 and injure her during batting practice:

- She has been to Safeco Field for a Mariners game between four to six times and sat in section 116 on several of those occasions.

- She choose to sit in section 116, an unscreened section, and arrived early at Safeco Field to specifically watch batting practice.

- When she arrived at her seat, she noticed players catching balls and a batter hitting balls.

- A foul ball landed near her seat before another foul ball hit her.

- She knew foul balls could reach the stands where she sat in section 116.

- She was familiar with baseball because she watched her child play it and attended many baseball games at both the Kingdome and Safeco Field.

- She was aware that neither a permanent nor temporary safety screen extended all the way down the first base line to protect her from foul balls.

- She tweeted several days after her injury that a foul ball landed in the stands near her seat on May 4, 2009, and that she wanted another foul ball to land near her.

---

43 5 Wn. App. 214, 218, 486 P.2d 336 (1971) (citation omitted) (emphasis added).

No reasonable juror could find that Teresa lacked knowledge of the specific risk of being hit by a foul ball while in section 116.

Moreover, Teresa is "deemed to have known and understood the risk of such injury where such risk would have been quite clear and obvious to a reasonably careful person under the same or similar circumstances."[44] The record reflects Teresa subjectively appreciated the risk of foul balls and she voluntarily chose to encounter that risk.[45]

The Jennings attempt to distinguish Taylor, but Taylor controls. There, a pitcher during "long toss" warm-ups before a Mariners game at Safeco Field accidentally threw a ball into the stands, injuring a patron. Taylor affirmed the trial court's dismissal of the patron's negligence claim under the implied primary assumption of risk doctrine. Taylor first determined "warm-ups are integral to the game of baseball and that a spectator assumes the risk of being struck by a baseball during warm-ups."[46] Second, Taylor determined "the circumstances leading to Taylor's injury" did not constitute "an unusual danger."[47] Third, Taylor determined the specific risk of injury from an errant throw during warm-ups was "foreseeable to a reasonable person with Taylor's familiarity with baseball," even though "no one . . . had ever seen someone hit by an overthrown ball during [warm-ups]."[48] Taylor concluded that the patron "assumed the risk of a ball

---

[44] Ridge v. Kladnick, 42 Wn. App. 785, 787, 713 P.2d 1131 (1986).

[45] She tweeted several days after her injury that she wanted a foul ball to land near her seat during batting practice.

[46] Taylor, 132 Wn. App. at 39.

[47] Id. at 40.

[48] Id. at 40-41.

entering the stands," and because the injury resulted from a risk inherent in the activity, the patron was barred from recovery.[49]

Similarly, Teresa's injury occurred during batting practice, also part of warm-ups, "an event necessarily incident to the game."[50] No evidence suggests the batting practice was conducted in an irregular manner. The Mariners' third base coach Jeff Datz stated that every other MLB team conducts batting practice in a similar manner as that conducted on the day of Teresa's injury. No evidence suggests the circumstances leading to Teresa's injury "constituted an unusual danger."[51] The parties do not dispute that (1) batting practice is part of the sport, (2) MLB teams typically conduct batting practice in the manner that can include more than one batted ball simultaneously in the air, (3) Teresa purposely attended batting practice, and (4) the Mariners permit spectators to view batting practice. As in Taylor, there were multiple balls simultaneously in the air at the time of Teresa's injury. The risk of Teresa's injuries "are within the normal comprehension of a spectator who is familiar with the game."[52]

Teresa contends that because she was distracted by a previously hit ball, she "could not be reasonably expected to avoid such an injury."[53] But the specific mechanism of the foul ball entering the stands has no bearing on the outcome. Batting practice typically involves pitchers throwing balls in quick succession with the chance that multiple balls could be simultaneously in play. A reasonable person in Teresa's shoes would know and consider that by choosing to sit in an unscreened area, there is

---

[49] Id. at 41.

[50] Id. at 39.

[51] Id. at 40.

[52] Id. at 40.

[53] Appellants' Br. at 45.

14

a possibility that a ball could enter the stands and injure her. Especially when a foul ball had just landed in Teresa's section moments before her injury, no reasonable juror could conclude that Teresa did not knowingly and voluntarily choose to encounter this specific risk. Even if this particular circumstance of multiple batted balls simultaneously in play could be considered "somewhat bizarre," assumption of the risk precludes recovery here.

Therefore, we conclude the Jennings' negligence claim is barred by the limited duty rule. Even if the limited duty rule did not apply, Teresa assumed the risk of a foul ball from batting practice entering the stands.

We affirm.

WE CONCUR: