# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PAMELA O'NEILL, | No. 47149-3-II |
| Appellant, | |
| v. | |
| CITY OF PORT ORCHARD, | PUBLISHED OPINION |
| Respondent. | |

SUTTON, J. — This appeal arises from Pamela O'Neill's bicycle accident in the City of Port Orchard (City). O'Neill filed suit against the City, claiming that a defect in the street pavement caused her accident. The superior court granted summary judgment in favor of the City.

We hold that the superior court erred by (1) excluding most of the bicycle expert's testimony under ER 702, (2) granting summary judgment regarding the City's duty, because there are genuine issues of material fact as to whether the City had constructive notice of the roadway defect, and (3) finding that implied primary assumption of the risk barred O'Neill from any recovery. Thus, we reverse and remand to the superior court for further proceedings consistent with this opinion.

## FACTS

### I. BACKGROUND

On July 18, 2009, O'Neill was commuting home from work when she was thrown from her bicycle at the intersection of Sidney Avenue and Kitsap Street in Port Orchard. O'Neill, an

experienced and skilled cyclist, rode a new route every day to challenge her "skilled abilities," and regularly commuted by bike to and from work. Clerk's Papers (CP) at 37. Before July 18, O'Neill had never ridden down Sidney Avenue.

As she rode down Sidney Avenue, O'Neill noticed a sign indicating a steep incline and she noticed a change in conditions from smooth to "uneven" with "lots of variations in the condition of the road." CP at 94. O'Neill understood the sign to mean that she should use caution traveling down the steep incline.

O'Neill continued down the hill. As she crossed the intersection, her bike changed direction, jerking the handlebars to the right and throwing her onto the ground, where she landed on her head and right shoulder. O'Neill suffered serious injuries.

## II. PROCEDURE

### A. LAWSUIT

O'Neill sued the City, alleging that it was negligent in failing to maintain Sidney Avenue in a manner that provided safe travel for bicycles. In her complaint alleging negligence against the City, she alleged that the road was "damaged" and that the surface variations and uneven road conditions caused her accident. CP at 94.

The City asserted several affirmative defenses, including assumption of risk. The City then moved for summary judgment and dismissal, arguing that the City did not owe O'Neill a special duty as a bicyclist above its "general duty to keep roadways reasonably safe for ordinary travel," that O'Neill failed to present evidence of any breach of a duty, and that O'Neill failed to show that the City had actual or constructive notice of any alleged defect in the roadway. CP at 20.

B.  SUMMARY JUDGMENT HEARING

At the hearing on the summary judgment motion, O'Neill submitted a deposition in which she stated that she was thrown from her bicycle because her front tire suddenly changed directions due to the uneven surface of the roadway.  She submitted photographs of the roadway around the accident site showing gaps between concrete slabs of up to four inches and height differentials of more than one inch.  One photograph depicts grass or weeds growing in the gaps.  In her deposition, O'Neill stated that she believed that it was the "uneven, loose gravel, [and] wider space" that caused her to fall, but she later admitted that she did not know exactly where the alleged defect was in the roadway that caused her to fall.  CP at 94.

Mark Dorsey, P.E., is the City's public works director and City engineer.  In his deposition, Dorsey stated that the City maintains the municipal roadways, including the intersection of Sidney Avenue and Kitsap Street where O'Neill fell.[1]  Dorsey stated that the City performs roadway maintenance on a complaint-based system initiated either by a complaint from the public or from a City employee.  Before 2008, the City had an informal complaint system.  After 2008, when Dorsey became public works director, the City has not received any complaints about the road surface conditions at the intersection of Sidney Avenue and Kitsap Road, and there are no maintenance records of any repairs at the intersection.  Before her accident, O'Neill never filed a complaint about the road conditions at the intersection and was unaware if any other cyclist had complained to the City.

---

[1] The record alternately refers to "Kitsap Street" and "Kitsap Boulevard."  For consistency, we use Kitsap Street, the name used by City entities.

Despite the absence of maintenance records, Dorsey admitted that there were older asphalt patches installed at different points in the intersection. The patches were installed before 2008, when public works employees would sometimes go out and perform minor maintenance on the roadways without keeping a record of their repairs. Because the concrete panels on Sidney Avenue rise and fall seasonally, the patches helped to alleviate some of the height differentials between the panels. Dorsey testified that the public works superintendent had no specific recollection of the patches being installed. While Dorsey acknowledged that the asphalt patches were worn and needed replacing, he was unaware of any specific issues related to the intersection of Sidney Avenue and Kitsap Street where O'Neill fell.

To rebut the Dorsey's testimony and the City's assertions, O'Neill offered the declaration of an expert, James Couch. Couch is a trained and certified bicycle technician and is a certified United States Cycling Federation cycling coach. He owned a bicycle store in Tacoma for 17 years, he provided coaching, training, and skills development services to cyclists throughout western Washington, and event and mechanical support to several organized cycling events. Couch served as a member of the University Place Economic Development Committee and Multnomah County Bicycle and Pedestrian Citizen Advisory Committee, advising both organizations regarding cycling facilities. Couch had testified or consulted in eight Washington cases as a bicycle expert, and other unidentified cases, but he provided no explanation or description regarding the nature and scope of his testimony or consultation.

Couch opined, in part, as follows:

13. The height difference between the slabs [of concrete] exceed 1 inch. This alone is enough to cause even the most skilled cyclist to lose control of their bike.

. . . .

4

17. Moreover, the defect is difficult for a cyclist to see. Defects that run nearly parallel to the direction of travel as opposed to those that run perpendicular to the direction of travel such as pot holes, for example, are very difficult for a cyclist to see while they are cycling.

18. Defects that run to the direction of bicycle travel are particularly hazardous, and need not be very large to cause a bicycle accident.

19. In this case, one of this size creates a significant hazard to cyclists given its size and length.

20. Once the cyclist's wheel engaged the defect, it would be extremely difficult for even the most experienced of cyclists to [maintain] control [of] their bicycle.

21. The location of the defect in the roadway is in a place that an experienced and skilled rider would most likely ride.

. . . .

25. The City of Port Orchard was aware, or should have been aware of this defect as evidenced by some prior attempts to repair the defect.

26. There is also physical evidence of repairs on the southbound (uphill) lane of traffic.

27. There is no evidence at the site or in City maintenance records that any type of comprehensive repair has been performed.

CP 124C-D.

The City argued in its reply that Couch's factual statements and opinions were "speculative" and that he was unqualified to offer an expert opinion regarding road design and human perception. CP at 128. The City asked the superior court to strike the parts of his declaration offering opinions on subject matter where he was not qualified to offer an opinion on the ultimate issue.

The superior court found that Couch was qualified under ER 702 "to testify as an expert as to owning and operating a bicycle store, how to fix a bicycle, how to fit a bicycle to the human body, how to train someone in cycling, and specifics on bicycle races." CP at 143 (FF 4). But the

superior court also found that Couch was not qualified as an expert under ER 702 in the fields of "(a) road design or defects, (b) bicycle accident reconstruction, and (c) road signage requirements and how humans visually perceive obvious versus vague signage." CP at 143 (FF 4). Thus, the superior court excluded Couch as an expert witness because his proffered testimony "'stray[ed] beyond' his 'area of expertise.'" CP at 144 (CL 8) (quoting *Hiner v. Bridgestone/Firestone, Inc.*, 91 Wn. App. 722, 735, 959 P.2d 1158 (1998), *rev'd*, 138 Wn.2d 248, 978 P.2d 505 (1999)).

Because it excluded Couch's opinions, the superior court found that O'Neill failed to rebut the City's initial showing that there were no genuine issues of material fact. The superior court then granted summary judgment for the City and dismissed O'Neill's claims with prejudice.

O'Neill moved for reconsideration. She argued that the photographs of the asphalt patches and defects around the intersection created a genuine issue of material fact as to the City's notice of the roadway defect, and that the superior court should reconsider its ruling that Couch was not qualified to testify and that O'Neill had assumed the risk of her injuries. The superior court denied O'Neill's motion for reconsideration.

O'Neill appeals the superior court's exclusion of her expert witness and its order of summary judgment in the City's favor.

## ANALYSIS

### I. EXCLUSION OF EXPERT WITNESS

O'Neill first argues that the superior court erred when it excluded all of Couch's declaration regarding the road and the accident. We hold that, although the superior court properly excluded limited portions of Couch's declaration, the superior court erred in excluding Couch's visual

6

observations of the road and his opinions regarding a cyclist's ability to see a defect and the effect of road conditions on the performance of a bicycle.

We review a superior court's ruling excluding an expert in a summary judgment proceeding de novo. *Davies v. Holy Family Hosp.*, 144 Wn. App. 483, 494, 183 P.3d 283 (2008) (citing *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998)).

ER 702 governs the admissibility of expert testimony at trial, and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Experience alone may qualify a person as an expert. *Katare v. Katare*, 175 Wn.2d 23, 38, 283 P.3d 546 (2012). "Once the basic requisite qualifications are established, any deficiencies in an expert's qualifications go to the weight," not the admissibility, of an expert's testimony. *Keegan v. Grant County Public Util. Dist. No. 2*, 34 Wn. App. 274, 283, 661 P.2d 146 (1983). Expert testimony must be "'sufficiently trustworthy and reliable to remove the danger of speculation and conjecture'" from the jury. *Larson v. City of Bellevue*, 188 Wn. App. 857, 880, 355 P.3rd 331 (2015) (quoting *State v. Maule*, 35 Wn. App. 287, 294, 667 P.2d 96 (1983)). An expert may not testify about information outside of his area of expertise. *Katare*, 175 Wn.2d at 38.

In *Katare*, the proffered expert's formal education did not include the field of child abduction. *Katare*, 175 Wn.2d at 38. However, he had 17 years of experience and knowledge, participating in organizations related to the field of child abduction attending numerous conferences, consulting with governmental entities, and testifying as an expert in abduction cases. *Katare*, 175 Wn.2d at 38-39. The superior court allowed the expert's testimony because it would

"assist [the court] in understanding the status of the literature on these topics." *Katare*, 175 Wn.2d at 33 (alteration in original, internal quotation marks omitted). Our Supreme Court held that the superior court did not abuse its discretion in admitting the expert's testimony. *Katare*, 175 Wn.2d at 39.

Couch's declaration testimony can be divided into three categories. First, paragraphs 8 and 12-16 of Couch's declaration involved his physical observations of the roadway, and were not expert opinions. Instead, Couch provided eyewitness testimony regarding the observed road conditions. We hold that the superior court erred in excluding this testimony.

Second, paragraphs 17-21, 23 and 30 of Couch's declaration involved expert opinions regarding a cyclist's ability to see a roadway defect and the effect of road conditions on the performance of a bicycle. Couch had 17 years of experience as a bicycle expert, extensive training regarding the performance and maintenance of bicycles, provided training and coaching to cyclists, consulted and testified in eight Washington cases as a bicycle expert, and advised University Place and Multnomah County regarding bicycle facilities. This knowledge, skill, experience and training qualified Couch as an expert on bicycle riding and the effect of road conditions on cyclists. We hold that the superior court erred in excluding this testimony.

Third, Couch provided expert testimony—in paragraphs 25-27 of his declaration— regarding evidence of repairs on the roadway and the City's notice of defective conditions on the roadway. There is no indication in the record that Couch is qualified to provide expert opinions on these issues, and we hold that the superior court did not err in excluding that testimony. We also hold that Couch's opinion in paragraph 29 of his declaration regarding O'Neill's character traits as a cyclist constituted a legal conclusion, and was improper. Thus, the superior court

properly struck his opinions offered on road maintenance, defects, and design, and on O'Neill's character traits.

## II. SUMMARY JUDGMENT

O'Neill further argues that (1) the City has a general duty to provide safe roadways for all expected traffic, including bicycles, (2) the City had constructive and actual notice of the roadway's defect, and (3) the City failed to maintain the road to ensure safe conditions for ordinary travel. She also argues that the superior court erred by ruling that the implied primary assumption of the risk doctrine barred any recovery because by engaging in bicycling as a sport, she assumed the risks inherent in biking on the roadway. We hold that (1) the City owes a duty to maintain its roadways in a condition that is reasonably safe for ordinary travel, which includes bicycle travel, (2) that there are genuine issues of material fact as to whether the City had constructive notice of the defects, and (3) that implied primary assumption of the risk does not bar any recovery.[2]

### A. LEGAL PRINCIPLES

Under CR 56, a party is entitled to summary judgment if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). "To avoid summary judgment in a negligence case, the plaintiff must show a genuine issue of material fact on each element of negligence—duty, breach, causation and damage." *Clark County Fire Dist. No. 5 v. Bullivant House Bailey, PC*, 180 Wn. App. 689, 699, 324 P.3d 743, *review denied*, 181 Wn.2d 1008 (2014). We review a summary judgment order de novo, construing all

---

[2] The City argues that the superior court did not err in granting summary judgment because O'Neill failed to prove that the City was the proximate cause of her injuries. Because the superior court did not address the issue of causation, we address only the issues of duty and breach.

facts and reasonable inferences in the light most favorable to the nonmoving party. *Clark County*, 180 Wn. App. at 698.

B. DUTY AND BREACH

    1. Legal Principles

Our courts generally hold municipalities to the same negligence standard as private individuals. *Keller v. City of Spokane*, 146 Wn.2d 237, 242-43, 44 P.3d 845 (2002). Whether a municipality owes a duty in a particular situation is a question of law, and, as an individual, a municipality owes a general duty of care of a "reasonable person under the circumstances.'" *Keller*, 146 Wn.2d 243 (quoting DAN B. DOBBS, THE LAW OF TORTS § 228, at 580 (2000). A municipality owes a duty to build and maintain roadways in a condition that is "reasonably safe for ordinary travel." *Keller*, 146 Wn.2d at 249. But a municipality does not, however, insure against an accident or guarantee the safety of travelers on its roads, nor is it required to "maintain streets in ideal traveling condition, nor to guard the traveling public from such normal hazards as small depressions in the surface of the roadway or ordinary puddles of water in the street." *Owens v. City of Seattle*, 49 Wn.2d 187, 191, 299 P.2d 560 (1956). A city is not required to maintain its roadways in a perfect condition, and the fact that there are potholes and defects in roadways are matters widely known to the public. *McKee v. City of Edmonds*, 54 Wn. App. 265, 268, 773 P.2d 434 (1989).

A municipality "'must have (a) notice of a dangerous condition which it did not create and (b) a reasonable opportunity to correct it before liability arises for negligence from neglect of duty to keep the streets safe.'" *Leroy*, 124 Wn. App. 65, 69, 98 P.3d 819 (2004) (quoting *Niebarger v.*

10

*City of Seattle*, 53 Wn.2d 228, 229, 332 P.2d 463 (1958)).  Notice may be actual or constructive.  *Nguyen v. City of Seattle*, 179 Wn. App. 155, 165, 317 P.3d 518 (2014).

2.  Bicycles as "Ordinary" Travel

The City argues that although a municipality has a duty to maintain its road for ordinary vehicle travel, it does not owe a duty to keep roads safe for bicyclists.  We hold that cycling is a mode of "ordinary travel," and therefore, the City has a duty to maintain its roads for bicycle travel.

Bicycles are an integral part of Washington's "statewide multimodal transportation plan," RCW 47.06.100.  Further, bicycles are subject to the same traffic laws as motorists and other vehicles when traveling on public roadways.

> Every person riding a bicycle upon a roadway shall be granted all of the rights and shall be subject to all of the duties applicable to the driver of a vehicle by this chapter, except as to special regulations in RCW 46.61.750 through 46.61.780 and except as to those provisions of this chapter which by their nature can have no application.

RCW 46.61.755(1).  RCW 46.61.770 regulates where cyclists may travel in the "normal flow of traffic," which direction they must travel, and how they must ride on roadways "except on paths or parts of roadways set aside for the exclusive use of bicycles."  RCW 46.61.770.

Our Supreme Court has also recognized that bicycles are a mode of transportation.  *See Camicia v. Howard S. Wright Const. Co*, 179 Wn.2d 684, 317 P.3d 987 (2014); *see also Pudmaroff v. Allen*, 138 Wn.2d 55, 63 n.3, 977 P.2d at 574 (1999).  Thus, we hold that bicycles, as a part of our statewide transportation plan, are a mode of "ordinary travel," and the City has a duty to maintain roadways that are safe for bicycle travel.

3. Actual Notice

O'Neill alleges that the City was on actual notice of the gaps in the road and the height differential between concrete slabs because there were "prior, ineffective, attempts to patch and repair" the road. Br. of Appellant at 27. There is, however, no evidence regarding the condition of the road at the time the patching occurred or the reasons for the repairs. The repairs may have fixed any defect existing at that time.

Further, Dorsey stated that the City had never received any complaints, from motorists or cyclists, about any defects at the intersection of Sidney Avenue and Kitsap Street. And Dorsey testified that there had been only one other accident at this intersection. We conclude that there is no evidence that the City had actual notice of the defective roadway condition at the intersection of Sidney Avenue and Kitsap Street where O'Neill fell.

4. Constructive Notice

Because there is no evidence that the City had actual notice of the defect in Sydney road, the question is whether it had constructive notice. Constructive notice arises where the defective condition has existed for such time that a municipality in exercising ordinary care would have discovered the defective roadway condition. *See Fredrickson v. Bertolino's Tacoma, Inc.*, 131 Wn. App. 183, 189, 127 P.3d 5 (2005). What constitutes constructive notice varies "with time, place, and circumstance." *Albin v. Nat'l Bank of Commerce of Seattle*, 60 Wn.2d 745, 748, 375 P.2d 487 (1962). Ordinarily, it is a question of fact for the jury to decide whether a defective condition existed long enough to be discovered. *Fredrickson*, 131 Wn. App. at 189.

Here, Dorsey testified that Sidney Avenue is one of the City's "major roads." CP at 111. The photographs and testimony about the condition of the road show that the alleged defects have

existed for a long period of time. For instance, one photograph depicts grass or weeds growing in the gaps. A fact finder could infer that the City had constructive knowledge of defects on one of its major roads that obviously have existed for years or decades. And Dorsey's knowledge of the roadway's construction—concrete panels that have "periodic seasonal lifting and settling" that causes height differentials—could allow an inference of constructive knowledge to the City. CP at 110.

Based on this record, we hold that there are genuine issues of material fact as to whether the City had constructive notice of the defective roadway conditions. Thus, we hold that the superior court erred by granting summary judgment and dismissing with prejudice O'Neill's action against the City.

C.  PRIMARY IMPLIED ASSUMPTION OF THE RISK

O'Neill argues that the superior court erred when it ruled that she assumed the risk of poor roadway surface conditions under the doctrine of implied primary assumption of the risk, which relieved the City of its duty to provide safe roadways. We agree.

The doctrine of assumption of risk limits the duty a defendant owes to a plaintiff. *Kirk v. Wash. State Univ.*, 109 Wn.2d 448, 454-55, 746 P.2d 285 (1987); *Leyendecker v. Cousins*, 53 Wn. App 769, 773, 770 P.2d 675(1989). "'[A]ssumption of risk is a matter of what the plaintiff knows, understands, and is willing to accept.'" *Reed-Jennings v. Baseball Club of Seattle, LP*, 188 Wn. App. 320, 331, 351 P.3d 887, *review denied*, 184 Wn.2d 1024 (2015) (quoting RESTATEMENT SECOND OF TORTS § 496C cmt. e. (1965)). There are four categories of assumption of risk, express, implied primary, implied reasonable, and implied unreasonable. *Barrett v. Lowe's Home Ctrs., Inc.*, 179 Wn. App. 1, 5, 324 P.3d 688 (2013). Express and implied primary assumption of risk

13

arise when a plaintiff consents to relieve a defendant of a duty owed to the plaintiff regarding specific known risks, and operate as a complete bar to recovery. *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 636-37, 244 P.3d 924 (2010).

In contrast, we treat implied unreasonable and implied reasonable assumption of risk as forms of contributory negligence, attributing some fault to the plaintiff and mitigating the amount of damages the plaintiff can recover. *Barrett*, 179 Wn. App. at 6. Implied unreasonable assumption of risks arises when the plaintiff knows about a risk created by the defendant's negligence, but voluntarily chooses to encounter it anyway. *Barrett*, 179 Wn. App. at 6.

Classic examples of implied primary assumption of risk occurs in sport-related cases where the plaintiff, a participant in the sport, "assumes the dangers that are *inherent in* and *necessary to*" the particular sport or activity. *Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 500-01, 834 P.2d 6 (1992). Cases since *Scott* have affirmed that, in order for implied primary assumption of risk to apply, the plaintiff's injuries must result from inherent and necessary risks associated with the particular sport or activity. *See Tincani v. Inland Empire Zoological Soc.*, 124 Wn.2d 121, 144, 875 P.2d 621 (1994) (holding that a fall sustained during rock climbing at a zoo was not inherent in the activity of visiting a zoo); *Barrett*, 179 Wn. App. at 7-8 (holding falling freight was not an inherent risk of plaintiff's job duties); *Taylor v. Baseball Club of Seattle, LP*, 132 Wn. App. 32, 38-39, 130 P.3d 835 (2006) (holding that the risk of being struck by a baseball is an inherent risk a spectator assumes when attending a pregame warm-up).

But implied primary assumption of risk does not apply when the defendant creates some additional risk and the plaintiff encounters that risk. *Gleason v. Cohen*, 192 Wn. App. 788, 800, 368 P.3rd 531 (2016).

> "[I]mplied reasonable and unreasonable assumption of risk arise where the plaintiff is aware of a risk that already has been created by the negligence of the defendant, yet chooses voluntarily to encounter it. In such a case, plaintiff's conduct is not truly consensual, but is a form of contributory negligence, in which the negligence consists of making the wrong choice and voluntarily encountering a known unreasonable risk."

*Scott*, 119 Wn.2d at 499 (quoting *Leyendecker*, 53 Wn. app. at 773-74).

The issue here is whether O'Neill assumed the risks of a defective roadway surface condition when she assumed the risks inherent in cycling to work. Falling is an inherent and necessary risk of the activity of cycling, and O'Neill assumed the general risk that she would fall off her bicycle and injure herself. She did not, however, assume the enhanced risks associated with the City's failure to repair an alleged defective roadway of which the City allegedly had constructive notice.

*Scott* is instructive. There, the plaintiff was injured while skiing on a slalom course when he hit a tow-rope shack adjacent to the course. *Scott*, 119 Wn.2d at 488. The Supreme Court held that although implied primary assumption of risk applied to the risks inherent in skiing, it did not apply to the defendant's negligence in placing a race course dangerously close to the shack. *Scott*, 119 Wn.2d at 500-03.

Under *Scott*, O'Neill did not assume the risk of the City's negligence. Thus, the superior court erred in ruling that implied primary assumption of risk barred O'Neill from any recovery against the City.

15

47149-3-II

## CONCLUSION

We hold that the superior court erred by excluding portions of O'Neill's expert's proposed testimony under ER 702, granting summary judgment because there are genuine issues of material fact as to whether the City had constructive notice of the roadway defect, and applying the doctrine of implied primary assumption of the risk to O'Neill's accident. Thus, we reverse and remand to the superior court for further proceedings consistent with this opinion.

Sutton, J.

SUTTON, J.

We concur:

Bjorgen, C.J.

BJORGEN, C.J.

Maxa, J.

MAXA, J.