**NOTICE:  SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/walawareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DAVID WALTER, | No. 82139-3-I |
| Respondent, | |
| v. | DIVISION ONE |
| SPEE WEST CONSTRUCTION CO., a Washington Corporation and general contractor, | PUBLISHED OPINION |
| Appellant, | |
| FIDELITY & DEPOSIT CO OF MD, | |
| Defendant. | |

SMITH, J. — David Walter was working in a trench at a construction site when an excavator bucket crushed his leg. He sued Spee West Construction Co. for negligence, and a jury found that Spee West's negligence was a proximate cause of Walter's injury, that Walter's non-economic damages totaled $4.5 million, and that Walter was 10 percent contributorily negligent. Spee West appeals, challenging the court's decision not to give an implied assumption of the risk jury instruction and its decision to give a lighting-up instruction. Because the assumption of the risk instruction was not warranted and the lighting-up instruction was supported by substantial evidence, we affirm.

FACTS

In April 2018, Spee West was working on a construction project at Mt. Si High School, and subcontracted with Continental Dirt Contractors for utilities

installation.  Walter, who had 15 years of construction experience, was offered a job as a pipe-layer for Continental Dirt and began work on April 11.  On that day, he met with his foreman and the other members of the Continental Dirt crew, and worked most of the day with Scott White, an excavator operator, fixing cracks in the sewer line at an excavation site.

On Walter's second day on the job, he again worked with White, digging a second excavation site to install a plug in the sewer line.  Walter finished that project while White moved to a third site, and then Walter went and joined him.  At the third excavation site, the goal was to remove a sewer line.  White used the excavator to dig down to the sewer line and Walter helped install a trench box, a piece of equipment used to protect workers from a possible trench cave-in.  The trench box consisted of two eight feet tall side panels separated by spreader bars used to keep the walls apart.  Once the trench box was installed, Walter's foreman told him to go into the trench to dig down and install a pump.  Walter got into the trench and began digging at the farthest point in the trench from the excavator, where the concrete column from under a manhole served as a wall.  He dug out a pile of debris and signaled for White to remove it, which White did.

When White brought the excavator bucket back, Walter signaled for it to go down, anticipating that White would continue digging at the other end of the trench, closer to the excavator.  Instead, White brought the bucket all the way down and smashed it into the concrete pipe.  Smashing the concrete and removing it was the planned method for removing the sewer line, but Walter had

No. 82139-3-I/3

not realized the plan until White brought the bucket down.[1]  Once Walter saw what White was doing, he "got onboard."  White brought the bucket up again, and Walter stepped back against the spreader bars at the end of the trench box, in a place where he could see and be seen by White, and signaled for the bucket to come closer.  Walter testified as to what happened next: "so the bucket had come up, it's coming in.  And then I told him, 'Down,' and I told him 'Down, down.'  And when I glanced up to see if he was looking at me, it looked like he was looking at [the excavator bucket's] teeth, not me."  The bucket continued coming closer and started crushing Walter's legs against the spreader bars.  Walter began feeling a "terrible" pain and started screaming until the pressure of the bucket released.

White, the only other witness to this event, testified that he could not see Walter at the time of the accident, that he was looking at the front of his bucket, and that he thought it was the curling of the bucket, not a movement forward, that crushed Walter's legs.  He also testified that the work had been proceeding safely up until that point and that there was no reason for Walter to feel unsafe in the thirty minutes leading up to the injury.

Following the accident, Walter was taken to the emergency room and stayed in the hospital for three days before being discharged with a knee brace and crutches.  An MRI[2] indicated a hole in the cartilage behind his kneecap, a

---

[1] While there was some evidence that a person did not need to be in the trench while a pipe was being removed in this way, there was also evidence that it is a common practice.

[2] Magnetic resonance imaging.

3

tear on the meniscus, bruising of the bones, fluid, and muscle strains.  Walter's

pain did not improve with physical therapy and he was referred to an orthopedic

surgeon.  Walter had surgery in December 2018, which helped, but his pain

continued to get worse.  Walter was eventually cleared to return to work in June

2019, but had to take a job as an excavator operator, rather than a pipe-layer,

because of the pain in his knee.

In December 2019, Walter sued Spee West for negligence.  The case

proceeded to a jury trial in September 2020.  Evidence at trial established that

standard procedure is for the person in the trench to direct the excavator with

hand signals and that the excavator operator is supposed to stop moving the

bucket if they lose sight of the hand signals.  The parties introduced evidence of

certain abnormalities at the construction site—the trench box was at an angle,

not level; White was using a larger than usual excavation bucket—but ultimately

Walter's theory of the case was that Spee West, through White, was negligent

through its failure to follow Walter's hand signals and continuing to move the

excavator without looking at his hand signals.

Walter's medical expert, Dr. David Spanier, testified that the accident

banged the bones in Walter's left knee together, causing bruising of the bone and

a hole in the cartilage behind his left kneecap which was the source of Walter's

pain.  Dr. Spanier also testified that the accident caused a tear in Walter's

meniscus that caused his knee to lock and buckle, but that this problem had

ultimately been resolved with surgery.  Spee West's medical expert, Dr. Alan

Brown, opined that Walter's pain was probably not related to the excavator

4

No. 82139-3-I/5

accident.  Dr. Brown also testified that the cartilage defect had been present since a 2005 soccer injury and that the defect was not caused by the 2018 accident.

At the end of trial, Spee West proposed an implied assumption of the risk jury instruction.  The court declined to give the instruction, finding that there was not substantial evidence that Walter had released Spee West from its duty of care.  Over Spee West's objection, the court did give the jury a lighting-up instruction, which provided,

> If your verdict is for the [p]laintiff, and if you find that:
>
> (1) before this occurrence the [p]laintiff had a bodily or mental condition that was not causing pain or disability; and
>
> (2) because of this occurrence the pre-existing condition was lighted up or made active,
>
> Then you should consider the lighting up and any other injuries that were proximately caused by the occurrence.

The jury found that Spee West was negligent, that its negligence was a proximate cause of injury to Walter, and that Walter's non-economic damages totaled $4.5 million.  It also found that Walter was negligent and that 10 percent of the negligence was attributable to Walter.

Spee West appeals.

ANALYSIS

Standard of Review

"The general test for reviewing jury instructions is whether the instructions, read as a whole, allow counsel to argue their theory of the case, are not

5

misleading, and properly inform the trier of fact of the applicable law." Kirk v. Wash. State Univ., 109 Wn.2d 448, 460, 746 P.2d 285 (1987). We review alleged legal errors in a jury instruction de novo. In re Det. of Taylor-Rose, 199 Wn. App. 866, 880, 401 P.3d 357 (2017). However, "[w]e review a trial court's decision to give a requested jury instruction for an abuse of discretion." Fox v. Evans, 127 Wn. App. 300, 304, 111 P.3d 267 (2005). The court should instruct the jury on theories that are supported by evidence, but if a theory lacks substantial evidence, the court must not instruct the jury on it. State v. Hoffman, 116 Wn.2d 51, 111, 804 P.2d 577 (1991); Fergen v. Sestero, 174 Wn. App. 393, 397, 298 P.3d 782 (2013), aff'd, 182 Wn.2d 794, 346 P.3d 708 (2015). "Substantial evidence" in this context means that the theory " 'rise[s] above speculation and conjecture.' " Fergen, 174 Wn. App. at 397 (quoting Bd. of Regents of the Univ. of Wash. v. Frederick & Nelson, 90 Wn.2d 82, 86, 579 P.2d 346 (1978)). In evaluating whether substantial evidence supports an instruction, we view the evidence in the light most favorable to the party requesting the instruction. State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000). "[A]n erroneous jury instruction is not grounds for reversal unless it affects or presumptively affects the outcome of the trial." Torno v. Hayek, 133 Wn. App. 244, 253, 135 P.3d 536 (2006).

Implied Primary Assumption of Risk Instruction

Spee West challenges the court's decision to not instruct the jury on implied primary assumption of the risk. We conclude that substantial evidence

No. 82139-3-I/7

did not support the instruction, and that therefore, the court did not err by not giving it.

Implied primary assumption of the risk is a bar to recovery in cases where the "plaintiff consented—before any act by the defendant—to relieve the defendant of any duty regarding a specific known hazard." Lascheid v. City of Kennewick, 137 Wn. App. 633, 641, 154 P.3d 307 (2007). Unlike contributory negligence, wherein a person's unreasonable assumption of the risk proportionally reduces their right to recover, implied primary assumption of the risk is a complete bar to recovery because the plaintiff has entirely negated the defendant's duty with regard to the risks assumed. Scott v. Pac. W. Mtn. Resort, 119 Wn.2d 484, 498-99, 834 P.2d 6 (1992). To warrant the instruction, "[t]he evidence must show the plaintiff (1) had full subjective understanding (2) of the presence and nature of the specific risk, and (3) voluntarily chose to encounter the risk." Kirk, 109 Wn.2d at 453.

Here, Spee West contends that Walter was aware that pipe laying involves the risk of getting hit by an excavator bucket and that he voluntarily encountered this risk. Specifically, Spee West contends he voluntarily encountered the risk when he continued work despite being surprised by the pipe removal plan and the bucket size and when he signaled for the excavator bucket to come nearer to him. However, Walter did not suggest that an unclear plan for removing the pipe or the unavailability of a smaller bucket caused the accident, but instead only contended that, "if [Walter's] hand signals had been followed,

7

No. 82139-3-I/8

there would have been no injury."[3]  There was no substantial evidence that the excavator operator not following hand signals is a risk inherent in and necessary to pipe laying, and Spee West does not contend that it did not have the duty to follow Walter's hand signals.  Instead, it argues that it was Walter's hand signals that brought the excavator bucket so dangerously close to him.  This underlying factual issue—whether Spee West was negligent because White did not follow Walter's hand signals or whether White did follow the hand signals and therefore Spee West was not negligent—was appropriately put before the jury.  Kirk, 109 Wn.2d at 454-55, 457 (trial court did not err by rejecting primary assumption of the risk instruction because although plaintiff may have assumed some risks inherent to cheerleading, defendant remained liable to the extent the plaintiff's injuries resulted from other risks, such as negligent coaching).  A contributory negligence instruction was appropriate because there was evidence that Walter assumed the risks that are inherent in pipe-laying, but Spee West failed to put forward any evidence that Walter consented to the specific risk of the excavator operator ignoring his hand signals.  See Scott, 119 Wn.2d at 503 (no implied assumption of the risk because, while plaintiff in skiing accident "did assume the risks inherent in the sport[,] . . . he did not assume the alleged negligence of the operator.").  Therefore, the trial court did not err by rejecting Spee West's assumption of the risk instruction.

---

[3] In closing arguments, Walter told the jury, "When [Spee West was] negligent in not following his hand signals and proceeding after they didn't see him and crushed his knee, that is why he has all of these symptoms for the rest of his life.  There's nothing else."

No. 82139-3-I/9

Spee West disagrees and contends that this case is analogous to Reed-Jennings v. Baseball Club of Seattle, 188 Wn. App. 320, 351 P.3d 887 (2015). In that case, Reed-Jennings was hit by a foul ball during batting practice before a Seattle Mariners baseball game. Reed-Jennings, 188 Wn. App. at 324. Although Reed-Jennings contended that "she did not fully subjectively understand the specific risk that she could be hit and injured by a foul ball sitting in an unscreened seat during batting practice when multiple batted balls are simultaneously in play," we noted that she was familiar with baseball games, chose to sit in an unscreened section, knew foul balls could and did reach the stands where she was sitting, and that she had wanted a foul ball to come near her. Reed-Jennings, 188 Wn. App. at 334-35. We concluded that Reed-Jennings "subjectively appreciated the risk of foul balls and she voluntarily chose to encounter that risk," and that the "specific mechanism of the foul ball entering the stands ha[d] no bearing on the outcome." Reed-Jennings, 188 Wn. App. at 335-36.

In this case, by contrast, Walter was not voluntarily choosing to encounter the risk of being crushed and he is not merely challenging the specific mechanism of his injury. Unlike Reed-Jennings and the foul balls, he anticipated that he would be in control of the excavator and did not consent to relinquishing that control. White agreed at trial that "the man in the trench is the boss" and that as an excavator operator, he was supposed to always follow Walter's hand signals. Thus, while Walter might have assumed some risks inherent to pipe-laying, he did not assume the risk of Spee West's negligent operation of the

9

excavator. Kirk, 109 Wn.2d at 454-55, 457. Spee West remains liable for the risks resulting from that negligent operation.

Lighting-Up Instruction

Spee West next challenges the court's decision to give a lighting-up jury instruction on the grounds that there was no evidence that a preexisting condition was lit up by the accident. We conclude that the court did not abuse its discretion by giving this instruction.

If an "injury lights up or makes active a latent or quiescent infirmity or weakened physical condition occasioned by disease, then the resulting disability is to be attributed to the injury, and not to the preexisting physical condition." Zavala v. Twin City Foods, 185 Wn. App. 838, 860, 343 P.3d 761 (2015); see also Harris v. Drake, 152 Wn.2d 480, 494, 99 P.3d 872 (2004) ("When an accident lights up and makes active a preexisting condition that was dormant and asymptomatic immediately prior to the accident, the preexisting condition is not a proximate cause of the resulting damages."). Put another way, the plaintiff's "previous physical condition . . . is immaterial and recovery may be had for the full disability independent of any preexisting or congenital weakness if the [plaintiff's] prior physical condition is not deemed the cause of the injury but merely a condition on which the real cause operated." Zavala, 185 Wn. App. at 860-61.

Here, Spee West concedes that there was some evidence that Walter had a preexisting condition and that it was not actively causing pain or disability before the accident, but contends that the evidence did not establish on a more

No. 82139-3-I/11

probable than not basis that the preexisting condition was lit up by the accident. However, viewed in the light most favorable to Walter, substantial evidence supports this element of lighting-up. Dr. Spanier and Dr. Brown both testified that after the accident, Walter had a hole in the cartilage behind his left kneecap. Unlike Dr. Spanier, Dr. Brown testified that this defect had existed in that location on Walter's cartilage since 2005 and that it was not caused by the 2018 accident. Dr. Spanier, on the other hand, testified that the hole was the source of the pain in Walter's knee, and that after the 2018 accident, there was bruising in the kneecap that lined up with the defect, consistent with bones banging together where the defect was. Dr. Spanier also testified to other factors that indicated that the 2018 accident had caused Walter's pain, such as the fact that in 2020, the cartilage around that same area of the knee cap had softened. The jury was not required to accept or reject either witness's testimony in its entirety, and could rely on any testimony, regardless of which party introduced it. Brewer v. Copeland, 86 Wn.2d 58, 74, 542 P.2d 445 (1975); Whitchurch v. McBride, 63 Wn. App. 272, 275, 818 P.2d 622 (1991). Thus, although no doctor testified that Walter had a preexisting defect in his kneecap cartilage that began causing pain as a result of the 2018 accident, the jury could believe Dr. Brown's testimony that the defect was preexisting and Dr. Spanier's testimony that the same area was banged by bones during the accident and was subsequently the source of his pain.[4] This is sufficient evidence from which the jury could find that the 2018

---

[4] Spee West contends that there was insufficient evidence that the accident lit up a preexisting defect because Dr. Brown only testified that it was "[p]ossible" that his preexisting problem was causing his pain. However, the

11

No. 82139-3-I/12

accident lit up a preexisting defect.  Because the evidence supporting the theory rises above speculation and conjecture, the court did not abuse its discretion by giving the lighting-up instruction.  Fergen, 174 Wn. App. at 397.[5]

We affirm.

_Smith, J._

WE CONCUR:

_Chun, J._              _Dwyer, J._

_____

combined testimony from Dr. Brown that that portion of Walter's cartilage had a preexisting defect, and from Dr. Spanier that that spot of the cartilage was injured during the accident and was the source of Walter's pain, is what provides the most compelling support for this theory.  This testimony was given on a more-probable-than-not basis.

[5] Moreover, we note that any error would be harmless.  The lighting-up instruction served to make clear to the jury that causation could not be negated merely by the presence of a dormant preexisting condition.  Harris v. Drake, 116 Wn. App. 261, 288, 65 P.3d 350 (2003), aff'd, 152 Wn.2d 480, 99 P.3d 872, is instructive.  In that case, Division Two held that the trial court did not err by excluding evidence of a preexisting condition because the condition was dormant and asymptomatic prior to the accident.  Harris, 116 Wn. App. at 288.  The existence of the condition "had no tendency to prove a fact of consequence to the action" because it could not serve to negate causation.  Harris, 116 Wn. App. at 288.  Similarly, here, Spee West does not contend that Walter's 2005 injury was symptomatic before the 2018 accident, and so the 2005 injury does not have any impact on the ultimate issue of whether the 2018 injury was the proximate cause of Walter's pain and suffering.  The jury found that Spee West's negligence caused Walter's pain and suffering, and both parties agree that Walter's 2005 injury cannot negate that causation.

12