[No. 27919.   Department Two.   August 9, 1940.]

ADRIAN WESTERBECK *et al.*, *Respondents*, v. R. C.
CANNON *et al.*, *Appellants*.[1]

*Henderson & McBee,* for appellants.

*Dave Hammack* and *James R. Hammack,* for re-
spondents.

[1]Reported in 104 P. (2d) 918.

JEFFERS, J.—This is an appeal by defendants R. C. Cannon and wife from a judgment made and entered by the superior court for Skagit county, on November 9, 1938, in an action wherein Adrian Westerbeck and Ida C. Westerbeck, his wife, were plaintiffs, and R. C. Cannon and wife, Harold C. Cannon, Arthur L. Christianson and wife, and C. R. Morgan and wife, were defendants.

The basis of this action, as shown by the complaint, is fraud, which it is alleged was perpetrated upon plaintiffs by defendant R. C. Cannon, while acting as the agent of plaintiffs for the purpose of selling their farm.

It is alleged that, in the deal, which was negotiated by defendant with the preconceived plan of defrauding plaintiffs, the latter were induced to sign an exchange agreement with defendant, agreeing to exchange their property for a house and two lots in Sedro-Woolley; that, in order to carry out the scheme whereby defendant R. C. Cannon was to obtain the property of defendants Christianson, he induced plaintiffs to make a deed to their twenty-acre farm in favor of Christianson and wife, and had the deed placed in escrow with John W. Brisky, an attorney of Mount Vernon, employed by Mr. Cannon to prepare the papers in this transaction; that Mr. Cannon also had defendants Morgan and wife, who owned the Sedro-Woolley property, make a deed to their property in favor of plaintiffs and place same in escrow, and he also had Christianson and wife make a deed to their property to Harold C. Cannon, his son, and this deed was also placed in escrow. It is further alleged that defendant R. C. Cannon had an option to purchase the Sedro-Woolley property for six hundred and seventy-five dollars, which was not known to plaintiffs, although defendant had title insurance put upon the Sedro-

Woolley property for twenty-five hundred dollars; that plaintiffs were not informed that Mr. Cannon was to get the Christianson property out of the transaction, which property was to have title insurance in the amount of three thousand dollars; that defendant R. C. Cannon paid nothing to defendants Morgan on the option until after the deed from Christiansons to Harold C. Cannon had been released, when a mortgage was given by the latter to Morgan and wife to secure a note for six hundred and forty dollars given by defendant R. C. Cannon to the Morgans in payment of the option. It is further alleged that plaintiffs did not understand the effect of the exchange agreement or deed, but believed that they would receive from one thousand to fifteen hundred dollars in cash in the exchange of their property for the Sedro-Woolley property. It is further alleged that Harold C. Cannon took title to the Christianson property, and held same for and on behalf of defendant R. C. Cannon.

The prayer of the complaint is that plaintiffs be restored to the legal and equitable ownership of their property; that defendants Christianson and wife, and Morgan and wife, be restored to the legal and equitable ownership of their respective properties; and that the deeds and contracts made by the respective parties be canceled and held for naught.

The answer of defendants Christianson and wife is to the effect that they knew nothing of, and were not interested in, the deal made by Cannon, other than that they knew they were to make a deed to their property to Harold C. Cannon and place the same in escrow with Mr. Brisky, and that, when title insurance was obtained on their property for three thousand dollars, and on plaintiffs' property for five thousand dollars, they were to receive a deed to plaintiffs' property, which was subject to a mortgage of about two thousand

dollars, which they were to assume; that the deed from plaintiffs to them has been released by the escrow holder and placed of record, and that their deed to Harold C. Cannon has been released and placed of record; that, subsequent to the release of their deed, Harold C. Cannon, on or about June 23, 1938, mortgaged a portion of the premises to C. R. Morgan, to secure the sum of six hundred and forty dollars, and also mortgaged a portion of the premises to one J. Reid Nelson, to secure the sum of one thousand dollars; that these defendants at all times acted in good faith.

Defendants R. C. Cannon and wife and Harold C. Cannon by their answer deny all the allegations of fraud. They admit that, on March 28, 1938, plaintiffs listed their property with them for sale, but deny that this transaction was made pursuant to such listing agreement, and allege it was made pursuant to the terms of the exchange contract of June 1st. They admit the respective parties executed deeds, which were placed in escrow with John W. Brisky, and that the deed from plaintiffs to Christianson and wife has been released and placed of record, as has also the deed from Christianson and wife to Harold C. Cannon, and they admit they have refused to have the deal canceled. They further allege that at all times plaintiffs knew and understood the effect of the exchange contract and the deed, and that this matter was explained to plaintiffs before the contract and deed were signed; that plaintiffs examined the Sedro-Woolley property, and did not rely on anything done, or statement made, by defendant R. C. Cannon; that, after plaintiffs had signed the deed and contract, they expressed complete satisfaction with the deal.

The answer of defendants Morgan and wife is to the effect that they, at the request of defendant R. C. Cannon, executed a deed to the Sedro-Woolley prop-

erty in favor of plaintiffs, and that the same was placed in escrow with Mr. Brisky until such time as title insurance in the amount of twenty-five hundred dollars could be obtained on the property; that they have no knowledge as to the other matters and things referred to in plaintiffs' complaint.

The cause came on for hearing before the court upon these pleadings; and after hearing the evidence and arguments, the court made and entered findings of fact, conclusions of law, and judgment. By the judgment, the court granted to plaintiffs the relief prayed for in their complaint and also canceled the mortgage given by defendant Harold C. Cannon to defendants Morgan and wife. This appeal is by R. C. Cannon and wife.

In this opinion, R. C. Cannon will be referred to as though he were the only party appellant.

Appellant admits that the questions presented are questions of fact, and that, if the lower court was correct in finding that the respondents were defrauded and overreached, the conclusion is correct; if not, the judgment should be reversed.

It is the position of appellant that respondents did not and could not meet the burden of proof, and that the evidence affirmatively shows that respondents were not defrauded.

It may be noted at this time that counsel for the respective parties proceed and argue from different standpoints and upon different theories. Appellant proceeds upon the theory that, in so far as this transaction is concerned, he was acting under and pursuant to the exchange contract of June 1st, was not acting as the agent of respondents, or acting in any fiduciary capacity; while respondents proceed upon the theory that, at all times herein referred to, respondents believed appellant was their agent, and that in fact, he was their agent.

The following is, we believe, a fair summary of the testimony of respondents' witnesses, from which it appears that respondents were elderly people, born in Finland, and having had very little education; that Mr. Westerbeck had mined a little since coming to this country, but for many years had been engaged in farming, and for about nineteen years had lived on and owned the land involved herein; that, while Mr. Westerbeck transacted the usual business connected with a farm, he did not read English well and could write very little; that, while at times he signed checks, he had them made out by someone else, except the signature; that neither of the respondents had had any experience with real estate agents or real estate deals; that Mr. Westerbeck's health had been poor for some time, apparently caused by hard work—he often complained of headaches and backache, and he was a little hard of hearing; that, because of his physical condition, and the further fact that his boys did not want to stay on the farm, Mr. Westerbeck thought he might sell his place and move to town.

The testimony further shows that, about this time, Mr. Westerbeck saw a blind ad in the Mount Vernon Herald, which stated: "I would like to buy a good farm for cash. Write Box 388, Daily Herald"; that Mr. Westerbeck had one of his boys answer the ad, and that thereafter appellant and a Mr. Yaeger, a real estate broker, came out to see respondents; that, as a result of the visit of Cannon and Yaeger, respondents, on March 28, 1938, signed a listing agreement, whereby they gave to appellant, for six months, the exclusive right to sell their property. It further appears from this agreement that the agreed selling price was fifty-five hundred dollars, this price including some livestock and farm machinery. The agreement further provided that the owner would accept the purchase

price above specified, less five per cent commission, or a net price of three thousand dollars above the mortgage. This agreement was witnessed by Mr. Yaeger.

The testimony further shows that respondents' farm consisted of twenty acres, all cleared, upon which there was a reasonably good house and barn; that respondents had paid seven thousand dollars for the place originally; that appellant came out several times and talked trade, but Mr. Westerbeck stated he did not want to trade, as he wanted money to live on.

It further appears that on some, if not all, of his visits, appellant was accompanied by Mr. Yaeger; that appellant treated Mr. Westerbeck fine, to use his own words:

"A. He treated me well and he always told me he was going to do straight dealing, so I believed him. Q. Did he tell you that more than one time? A. Every time he going to do a square, square deal, and if he couldn't do a square deal he going to throw the whole business in the river."

It further appears that, after several visits of appellant and Mr. Yaeger to respondents' home, appellant and Yaeger took respondents up to Sedro-Woolley to see the Morgan property; that at that time appellant had an option to purchase this property for six hundred and seventy-five dollars, but did not inform respondents of this fact; that, on this visit to Sedro-Woolley, Mr. Westerbeck informed appellant that he would have to have twenty-five hundred dollars to boot, if he traded his property for the Sedro-Woolley property; that nothing definite was decided on during this visit; that afterwards appellant and Yaeger went out to respondents' home and said they would be out some day with some papers to sign; that, on June 1st, appellant, Mr. Yaeger, and Mr. Brisky went out; that the three men last mentioned went into the house and Mr. Brisky

was introduced, and then Mr. Brisky stated he had some papers for them to sign. We again quote from Mr. Westerbeck's testimony, which is corroborated by the testimony of Mrs. Westerbeck:

"Q. What kind of papers? A. I asked them what kind of papers to sign; it is some sales agreement. Q. What was done then? A. Mr. Brisky took the papers and spread them out on the table and he told me to come and sign, so I want to know what kind of paper it is, so he said a sales agreement paper, and I wrote it. Q. You read it, you mean? A. Yes. Q. And they told you it was what, Mr. Westerbeck? A. It was a sales agreement. Q. Who told you that? A. Mr. Cannon and Mr. Yeager."

It appears that Mr. Brisky was not representing respondents at this time, but had been employed by appellant.

It further appears that, while respondents did not remember signing other than an escrow agreement, they did in fact sign an exchange contract, in which appellant was named as party of the second part, whereby respondents agreed to exchange their property, which was valued therein at forty-five hundred dollars, for the Sedro-Woolley property of defendants Morgan, which property was valued in the agreement at twenty-five hundred dollars. It also appears that on this visit of June 1st, respondents signed an escrow agreement wherein it was agreed that they would sell their property to defendants Christianson and wife for ten dollars and other good and sufficient consideration, and would sign and place in escrow with Mr. Brisky a warranty deed to their property, and that the Christiansons would assume the mortgage of $1,991.13 on respondents' property. We desire to again quote from Mr. Westerbeck's testimony relative to the signing of the paper on June 1st:

"Q. You signed a paper? A. I signed a paper. Q. You say you read it? A. I read it, but I couldn't understand

what it was, but I couldn't find out anything which should bind me into it. Q. I show you plaintiffs' Exhibit 'D' [the escrow agreement], I will ask you if you know what that is? A. Escrow agreement—I don't know what it is. Q. Did you see that paper out there that day? A. Yes. Q. What paper did you read when Mr. Brisky and Mr. Cannon and Mr. Yeager came out there? A. It was a paper like this. Q. A paper like that? A. Yes. Q. What did you say to them when they wanted you to sign? A. I say I can't see anything that would bind me up. They said there is nothing to bind you up, it is a sales agreement."

It further appears that Mr. Westerbeck's son Ernie examined the escrow agreement only, and advised his father he could see nothing to bind him in that paper. It appears that Mr. Westerbeck did not definitely remember how many papers he signed, but only remembered signing the escrow agreement, a copy of which was left with respondents.

It further appears that, a few days after these papers had been signed, Mr. Westerbeck began to worry about what he had done, occasioned apparently, in the first instance, by a remark which he testified Mr. Yaeger made about storing the machinery in the barn and having a sale of respondents' personal property; that Mr. Westerbeck talked to some of his neighbors and expressed himself as being fearful that he was going to lose his place, and that he had signed something which he should not have signed; that, during this time, Mr. Westerbeck complained of his head, and did not seem to understand what had taken place, or what he had signed.

It appears that, at about this time, Mr. Westerbeck met Mr. Christianson, and they talked about the matter, and went up to Mr. Brisky's office, where they saw appellant. Mr. Westerbeck testified:

"I told him I wasn't going through with this deed because it wasn't a square deed what he promised us.

He said he going to force it through. And Mr. Christianson said, 'Well, I can back out, you haven't got anything against me.' And Mr. Cannon jumped up on the chair and said, 'The heck I haven't got anything; I got your signature and your wife's signature on here.' Mr. Christianson said, 'You got something on me I never knew of.' "

It further appears from the testimony of several witnesses who had lived in the vicinity of respondents' farm, and who had owned, or owned, similar property, and knew of the sale of similar land, that the fair cash market value of respondents' property was five thousand dollars, and it further appears from the testimony of two witnesses that the fair market value of the Sedro-Woolley property was not to exceed eight hundred dollars.

It further appears from the uncontradicted testimony that appellant is not a licensed real estate broker, but that Mr. Yaeger, of Bellingham, is, and that the ad herein referred to was inserted by Mr. Yaeger; that, after Mr. Yaeger received the card from respondents, in answer to the ad, he went in to see appellant, whom he knew, and it was decided that appellant and Mr. Yaeger would go out together and see respondents. It is admitted that appellant has paid nothing on the Morgan option, and has put nothing into this transaction, other than his time, and that, if this transaction goes through, appellant will get the Christianson property, which is being held for him by his son, Harold C. Cannon, and which property was valued at three thousand dollars, subject to the mortgage of six hundred and forty dollars, given to Morgan to secure a note given by R. C. Cannon in payment of the option. It is also admitted that neither appellant nor Mr. Yaeger ever told Mr. Brisky that they were going to get the Christianson property out of the deal, and it appears that all Mr. Brisky knew about the matter

was that he was to prepare the papers, in none of which did the name of appellant or Yaeger appear, except in the exchange agreement.

The testimony of appellant, which is largely corroborated by that of Mr. Yaeger, is to the effect that he had never met Mr. Westerbeck prior to the transaction in question; that he had been in the real estate business for a good many years, as also had Mr. Yaeger; that appellant and Mr. Yaeger went out to see Mr. Westerbeck about selling his place, and as a result of such visit or visits, the listing agreement of March 28th was drawn up by appellant, signed by respondents and appellant, and witnessed by Mr. Yaeger. It further appears from the testimony offered by appellant, that an effort was made to dispose of respondents' property according to the listing agreement, but that no sale could be effected; that several visits were made to the Westerbeck home, where the matter was discussed; that finally Mr. Westerbeck was asked about trading his property for town property, and appellant and Mr. Yaeger were informed that respondents might make such a trade, but that they would have to have some money to live on; that, as a result of this conversation, respondents were taken up and shown the Sedro-Woolley property; that respondents finally agreed that they would trade their property for the Sedro-Woolley property, if they could get one thousand dollars cash out of the deal.

The testimony of appellant, corroborated by Mr. Yaeger, is further to the effect that, under the agreement last mentioned, all of the livestock and machinery was to be included; that, in a further conversation, it was decided that respondents should keep the livestock and machinery and sell it themselves, and that they would trade their property for the Sedro-Woolley property; that thereafter appellant, Mr. Yaeger, and Mr. Brisky,

whom appellant had hired to prepare the papers, went out to the Westerbeck place and there procured the signature of respondents to the exchange contract and escrow agreement and deed; that Mr. Brisky explained to respondents what the papers meant, and respondents read them over, and had their son read them over.

It further appears that, at the time appellant and Mr. Yaeger went out to the Westerbeck home and procured the papers last above mentioned, they had the Christianson papers all signed up, although, as hereinbefore stated, Mr. Westerbeck was not told anything about the fact that appellant in the deal was to get the Christianson property, nor that appellant had an option to purchase the Morgan property for six hundred and seventy-five dollars.

It appears that it took some time to get a certificate of title to the Sedro-Woolley property, and according to the testimony of Mr. Brisky, Mr. Westerbeck came into his office twice to see about the title and expressed no dissatisfaction with the deal. It further appears that the mortgage given by Harold Cannon to Nelson on the Christianson property was given after the *lis pendens* notice in this action was filed, and that Cannon has made satisfactory arrangements with Nelson, in the event the judgment of the trial court is sustained. It further appears from the testimony of several real estate men, offered on behalf of appellant, that respondents' property was worth thirty-five hundred dollars, and that the Sedro-Woolley property was worth from twelve hundred to fifteen hundred dollars.

Appellant contends that, after the signing of the exchange contract on June 1st, he was no longer acting as agent for respondents, but was dealing with them as any person not acting in a fiduciary relation had a right to act.

The trial court, who heard and saw all the witnesses

in this case, in summing up the situation after the case was closed, stated:

"Mr. and Mrs. Westerbeck impressed me, observing them on the witness stand, that anyone whom they took into their confidence, or who won their confidence, that they would absolutely believe that person and put every confidence in the person whom they thought was a person to be trusted. They are friendly in nature, not very much versed in worldly experience as it is today, but just old fashioned people who when they think they have a friend truly trust him to the fullest extent.

"On the other hand, my observation of Mr. Cannon and Mr. Yaeger is that they have been in the real estate business for several years. Mr. Yaeger is not engaged in the real estate business in this county. Mr. Cannon is lightning fast in his thoughts and actions and Mr. Yaeger is plausible and ingratiating in his nature and disposition, and both of these gentlemen in their experience in the real estate business have had about all the experience that real estate men can experience in twenty years of time. . . .

"They [referring to Cannon and Yeager] made various visits out there to Mr. Westerbeck and to his family and ingratiated themselves into his confidence, he and his wife, and Mr. Westerbeck was, I think, under the impression at all times in this case that Mr. Cannon and Mr. Yaeger were working in his behalf. Instead of working in his behalf they were working in their own behalf. They shifted this matter around until they got the matter lined up in their own interests, and in lining the matter up in their own interest they, of course, took in Mr. Morgan and Mr. Christianson. However, I do not think Mr. Morgan and Mr. Christianson were in any way connected with the matter of Mr. Cannon and Mr. Yaeger in their treatment of him later on. . . .

"Now, the property in Sedro-Woolley, the court finds, is not worth over $800.00. I don't think it is worth $800.00. . . .

"The matter goes along up until the time of the signing of this agreement, this escrow agreement. It is

a peculiar thing that in this entire transaction that Mr. Christianson and his wife would sign deeds and know nothing about it, and Mr. Westerbeck would do the same thing. Mr. Christianson, with all the intelligence and business experience that he has had, and his wife testified that they did not go up there for the purpose of signing a deed, but simply signing an escrow agreement. . . . If Mr. Westerbeck did know that he was signing the deed it is the opinion of this court that when he did sign those deeds, if he did so sign them of his own knowledge and free will, signed them under the impression that at least he was getting $1,000.00 or $1,500.00 to boot between the equity in his place and the property at Sedro-Woolley. . . . Mr. Westerbeck's property was worth in the opinion of this court, the price that was put on it by himself, by his neighbors there who know the property and who bought property adjoining, and that it is a fair value that he had on the place, and it is the conclusion of this court that Mr. Cannon and Mr. Yaeger defrauded this man."

■ Appellant cites us to the rule that, before a contract can be rescinded for either fraud, duress, or undue influence, and, in some situations, want of consideration, the fraud must be shown by clear and convincing evidence. In support of this rule, appellant cites 9 Am. Jur. 359; 9 C. J. 1161; *Pickle v. Lincoln County State Bank*, 61 Wash. 545, 112 Pac. 654; *Jarvis v. Ireland*, 89 Wash. 286, 154 Pac. 455; *Hurley v. Lindsay*, 105 Wash. 559, 178 Pac. 626; and *Gudmundson v. Commercial Bank & Trust Co.*, 138 Wash. 355, 244 Pac. 676. We are in accord with the rule as stated in the texts, and as applied in the cited cases, but we are of the opinion that the authorities cited are not applicable here, for the reason that there was no question of a fiduciary relation existing between the parties in the cited cases.

■■ We are of the opinion, after a consideration of this entire record, that respondents believed at all times after the signing of the listing agreement of

March 28th, that appellant was acting in their behalf and as their agent, being assisted by Mr. Yeager; and that, under the facts and circumstances of this case, there was a fiduciary relation existing between appellant and respondents after the signing of the listing agreement, and this relationship continued at all times, notwithstanding the exchange agreement executed on June 1, 1938.

The duty which one acting in a fiduciary relation owes is stated in 4 R. C. L. 492, as follows:

"A person is said to stand in a fiduciary relation to another when he has rights and duties which he is bound to exercise for the benefit of that other person. In such case he is not allowed to derive any profit or advantage from the relation between them, except upon proof of full knowledge and consent of such other."

We are satisfied that respondents believed that appellant was their agent, and acting in their behalf, and that appellant must have realized that this was the situation. We are also convinced that respondents were not informed, and did not know or believe, that this situation was or could be changed by the exchange agreement. Clearly, we think that, under the situation appearing at the time the exchange agreement was signed, it was appellant's plain duty to have informed respondents of his interest in the Sedro-Woolley property, and of the further fact that, if the deal went through, he would get the Christianson property; in other words, that he would profit by the deal to the extent of the value of the Christianson property, less the amount for which it was mortgaged to secure the note given to Mr. Morgan in payment of the option.

"The duty and liability of a broker to his employer are essentially those of an agent required to exercise fidelity and good faith toward his principal in all mat-

ters that fall within the sphere of his employment." 4 R. C. L. 269.

We find the following statement of the rule in *Cantwell v. Nunn,* 45 Wash. 536, 88 Pac. 1023:

"The law exacts of every agent the utmost fidelity to his principal. He must keep him fully informed as to all his transactions, and the state of the business or interests entrusted to him. Any departure from these rules is a fraud in law. An agent to sell cannot become the purchaser, and an agent to buy cannot be himself the seller. Equity removes from the trustee every temptation to violate his trust by declaring in advance that all such transactions are null and void at the option of the principal, and the wisdom of this rule is fully demonstrated by the record before us."

See, also, 21 R. C. L. 829-830; *De L'Archerie v. Rutherford,* 54 Wash. 134, 102 Pac. 1033; and *Breedlove v. Holton,* 143 Wash. 347, 255 Pac. 132.

Appellant contends that the record does not show a single false statement made to respondents by either appellant or Mr. Yeager. However that may be, we think actions may speak louder than words, and we are clearly of the opinion that the acts of appellant indicate a course of conduct, carried out with the intent of deceiving respondents, which was just as reprehensible as though appellant had verbally made misrepresentations, and we are also satisfied that appellant cannot escape liability for the wrong caused by such acts, and that such acts constitute fraud in law.

Appellant also contends it was not shown that Mr. Westerbeck was so incompetent as not to be able to understand what he was doing and what he was signing, citing authority to sustain the rule that old age is not a ground for invalidating a contract. We do not understand that the mental and physical condition of Mr. Westerbeck was the sole ground upon which this action was based, but that it was only one of the

factors to be considered. In 9 Am. Jur. 363, cited by appellant, we find the rule stated:

"Old age is not a ground for invalidating a contract, unless combined with weakness of mind and fraud or undue influence."

We have considered this testimony relative to the physical and mental condition of Mr. Westerbeck, in connection with the fraud which we believe to have been perpetrated upon him.

It is finally contended by appellant that the trial court ignored the rule relative to the preponderance of the evidence, and fixed the value of respondents' farm at five thousand dollars. We cannot be governed entirely by the number of witnesses who may testify to a particular state of facts. The trial court saw and heard all these witnesses, and we are not prepared to say the court was not right in accepting the amount of five thousand dollars fixed by respondents' witnesses as the value of their farm, instead of the sum of thirty-five hundred dollars fixed by the witnesses for appellant. What we have said in regard to the value of respondents' property also applies to the value placed on the Sedro-Woolley property.

We are also satisfied that respondents never expressed satisfaction with this transaction after they discovered what had actually happened, and the effect of the exchange contract and deed signed by them.

We are in accord with the summary of the trial court, and, applying the proper legal principles to the established facts, we are clearly of the opinion the judgment of the trial court was right.

The judgment is affirmed.

BLAKE, C. J., BEALS, STEINERT, and DRIVER, JJ., concur.