# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| WAYNE WRIGHT, individually and as personal representative for the estate of WARREN WRIGHT, deceased,<br><br>　　　　　Respondent,<br><br>　　　v.<br><br>3M COMPANY, f/k/a MINNESOTA MINING & MANUFACTURING COMPANY; E.J. BARTELLS SETTLEMENT TRUST; SHELL OIL COMPANY; TEXACO, INC.; U.S. OIL & REFINING COMPANY,<br><br>　　　　　Defendants,<br><br>EXXONMOBIL OIL COMPANY,<br><br>　　　　　Appellant. | No. 81289-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — Wright sued ExxonMobil and others for his father's wrongful death from mesothelioma as a result of asbestos exposure in oil refineries while working for an independent contractor, Northwestern Industrial Maintenance. The other companies settled, but Mobil proceeded to trial. Mobil raises several issues on appeal pertaining to jury instructions, evidentiary issues, jury selection, and the reasonableness of settlement agreements. We affirm the jury verdict, but vacate the judgment and remand for a new reasonableness hearing.

FACTS

From the mid 1950's until 1988, Mobil[1] operated a refinery in Ferndale, Washington. In 1979, Northwestern Industrial Maintenance (NWIM) was contracting with Mobil, to perform maintenance jobs at the Mobil refinery in Ferndale. NWIM employed Warren Wright as a working foreman on a crew at the Ferndale facility. Wright was involved in a NWIM job that entailed demolition of insulation from the pipes, pumps, and other equipment in an out of service unit of the refinery. The NWIM workers were informed that the old insulation contained asbestos. During the demolition, the employees took precautions including the use of respirators and wet methods to minimize airborne particles. That job lasted three months.

Wright continued working for NWIM at various refineries until 1988. Wright died in September 2015. An autopsy performed on his lungs revealed that Wright had suffered from mesothelioma.

In January 2018, Wright's son, Wayne Wright, filed a wrongful death suit individually and on behalf of Wright's estate.[2] The lawsuit named defendants Mobil, Shell Oil Company, Texaco Inc., and U.S. Oil and Refining Company who owned the refineries where Wright had worked while employed by NWIM. Wright also included 3M Company, the manufacturer of the face mask worn by Wright and his coworkers, as a defendant.

---

[1] ExxonMobil Oil Company is the successor-in-interest to Mobil Oil Corporation. Mobil was the name when Warren Wright worked at the refinery.

[2] For the purposes of this opinion, we use "Wright" for both Warren Wright individually as the employee and plaintiff/appellants Wayne Wright and the Estate of Warren Wright collectively.

Shell, Texaco, U.S. Oil, and 3M all entered settlement agreements with Wright. Mobil proceeded to trial. The jury returned a $4 million verdict for Wright. The trial court held a reasonableness hearing and determined the settlement agreements with Shell, Texaco, U.S. Oil, and 3M were reasonable. The court then calculated the set-off for the amounts of the settlement and entered a judgment of $2,270,000.00 plus attorney fees and costs and postjudgment interest. The court denied Mobil's posttrial motions for a judgment as a matter of law and for a new trial. Mobil appeals.

DISCUSSION

I.   Jury Instructions

Mobil argues the trial court erred by omitting several jury instructions. Generally, the decision to give a particular jury instruction is within the trial court's discretion. Taylor v. Intuitive Surgical, Inc., 187 Wn.2d 743, 767, 389 P.3d 517 (2017). "Where substantial evidence supports a party's theory of the case, the trial courts are required to instruct the jury on the theory." Id. An appellate court reviews a trial court's decision to give a jury instruction de novo if based on a matter of law or for abuse of discretion if based on an issue of fact. Id.

"Jury instructions (1) cannot be misleading, (2) must allow counsel to argue their theory of the case, and (3) must properly inform the jury of the applicable law, when read as a whole." Spencer v. Badgley Mullins Turner, PLLC, 6 Wn. App. 2d 762, 787, 432 P.3d 821 (2018). An instruction is erroneous if it fails to satisfy these criteria. Id. An erroneous instruction is not reversible unless it is prejudicial. Id.

Prejudice is assumed if the instruction is a clear misstatement of the law, but must be demonstrated if the instruction is merely misleading. Id. at 787-88.

A. Liability Instructions

Wright based his negligence claim for asbestos exposure on two discrete theories: (1) Mobil retained control over NWIM and failed to exercise ordinary care in overseeing its work; and (2) Mobil failed to use ordinary care for Wright's safety as an invitee onto its property. The jury returned a verdict for Wright on both theories. As a result, reversal is necessary only if the court's actions rose to the level of prejudicial error for instructions related to both theories.

1. Retained Control

The parties do not dispute that Wright was an employee of independent contractor NWIM, rather than an employee of Mobil. Instead, Wright argues that Mobil had liability for his asbestos exposure because it retained control of the workplace. The trial court instructed the jury on Wright's proposed instruction for the theory of retained control:

> An owner and/or operator of a refinery "retains control" over the work of a contractor when it either (1) retains the right to direct the means and manner in which a contractor works or (2) retains the right to require use of safety precautions or otherwise assumes responsibility for worker safety.

Mobil argues this instruction was erroneous because it permitted the jury to find for Wright "based solely on Mobil's contractual requirement that NWIM follow prevailing safety laws."

"The scope of an employer's liability depends on whether the worker is an independent contractor or an employee." Kamla v. Space Needle Corp., 147

4

Wn.2d 114, 119, 52 P.3d 472 (2002). Employers are not liable for injuries incurred by independent contractors because the employers cannot control the manner in which independent contractors work. Id.

As an exception to this rule, an employer may be liable to an independent contractor where it has retained the right to direct the manner in which work is performed. Id. "'Whether a right to control has been retained depends on the parties' contract, the parties' conduct, and other relevant factors.' The proper inquiry is whether the jobsite owner retains the right to direct the manner in which work is performed, not whether it actually exercises that right." Hymas v. UAP Distrib., Inc., 167 Wn. App. 136, 154, 272 P.3d 889 (2012) (citation omitted) (quoting Phillips v. Kaiser Aluminum & Chem. Corp., 74 Wn. App. 741, 750, 875 P.2d 1228 (1994)).

The case law establishes the proper inquiry for whether the employer retains control as "whether there is a retention of the right to direct the manner in which work is performed." Kamla, 147 Wn.2d at 121. The first part of the jury instruction properly reflects the Kamla test. However, the second part of the instruction that allows for a finding of retained control if Mobil "retains the right to require use of safety precautions or otherwise assumes responsibility for worker safety," stems from Kelley v. Howard S. Wright Constr. Co., 90 Wn.2d 323, 330-31, 582 P.2d 500 (1978).

Kelley involved a lawsuit against a general contractor by an injured employee of a subcontractor. Id. at 326. In its contract with the owner of the project, the general contractor "assumed sole responsibility for supervising and

5

coordinating all aspects of the work." Id. at 327. The general contractor agreed to be responsible for "initiating, maintaining and supervising all safety precautions and programs in connection with the work." Id. It "had general supervisory and coordinating authority under its contract with the owner, not only for the work itself, but also for compliance with safety standards." Id. at 331.

The court's determination of retained control in Kelley arose because of the general contractor's contractual responsibility for establishing and maintaining safety precautions for the project. See also Straw v. Esteem Constr. Co., 45 Wn. App. 869, 875, 728 P.2d 1052 (1986) ("In Kelley the court found the contractor had assumed contractual responsibility for initiating and maintaining a safety program, and thus responsibility for supervising the subcontractor's work to insure it complied with safety standards."). The significance of actual involvement in a safety measure is confirmed by subsequent cases: "It is one thing to retain a right to oversee compliance with contract provisions and a different matter to so involve oneself in the performance of the work as to undertake responsibility for the safety of the independent contractor's employees." Hennig v. Crosby Grp., Inc., 116 Wn.2d 131, 134, 802 P.2d 790 (1991) (emphasis omitted). The employer must actively involve itself with the operation of safety measures to retain control. Id. Contract language that provides for inspections to ensure compliance with relevant laws and regulations is not enough to constitute retained control. Cano-Garcia v. King County, 168 Wn. App. 223, 237, 277 P.3d 34 (2012).

In this case, the jury instruction allowed the jury to conclude that Mobil retained control because it required NWIM employees to comply with its general

6

safety rules and Occupational Safety and Health Administration (OSHA) regulations. This is far below the contractual obligation for undertaking safety procedures that <u>Kelley</u> identified as the reason for retained control. Moreover, it is directly contrary to the case law establishing that the right to ensure compliance with relevant laws and regulations does not constitute retained control. <u>See</u> <u>Cano-Garcia</u>, 168 Wn. App. at 237. As a result, the retained control jury instruction is a clear misstatement of the law. Such an error is presumed prejudicial and requires reversal. <u>See</u> <u>Hendrickson v. Moses Lake Sch. Dist.</u>, 192 Wn.2d 269, 281, 428 P.3d 1197 (2018).

    2. <u>Premises Liability</u>

Mobil argues the trial court also provided an incorrect jury instruction on its duty of care to Wright as a business invitee.

The legal duty owed by a landowner to a person entering the premises depends on whether the entrant was a trespasser, licensee, or invitee. <u>Kamla</u>, 147 Wn.2d at 125. Employees of independent contractors are business invitees on the landowner's premises. <u>Id.</u> The parties do not dispute Wright's status as an invitee. A landowner owes an invitee the duty of care set forth in the <u>Restatement (Second) of Torts</u> § 343 (Am Law Inst. 1965):

> "[a] possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, [the possessor]
>     "(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>     "(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>     "(c) fails to exercise reasonable care to protect them against the danger."

7

Tincani v. Inland Empire Zoological Soc., 124 Wn.2d 121, 138, 875 P.2d 621 (1994) (alterations in original) (quoting RESTATEMENT § 343). Restatement § 343A further explains the duty owed to an invitee for known or obvious dangers on the premises: "'(1) A possessor of land is not liable to . . . invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." Id. at 139 (alteration in original) (quoting RESTATEMENT § 343A). The Washington Supreme Court established that section 343A "is the appropriate standard for duties to invitees for known or obvious dangers." Id.

When instructing a jury on the duty owed to an invitee for known or obvious dangers, "it is ordinarily the better practice to give both Section 343 and Section 343A(1) instructions." Suriano v. Sears, Roebuck & Co., 117 Wn. App. 819, 831, 72 P.3d 1097 (2003). The Washington Pattern Jury Instructions reiterates this, "[i]n cases involving invitees and known or obvious dangers, the jury should be instructed in accordance with both sections 343 and 343A of the Restatement." 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 120.07 cmt. at 797 (7th ed. 2019).

In this case, Mobil proposed a jury instruction that included the language of section 343A: "A possessor of land is not liable to his business invitee for physical harm caused to him by an activity or condition on the land whose danger is known or obvious to him, unless the possessor should anticipate the harm despite such knowledge or obviousness." The court declined to give this instruction, choosing

to provide a jury instruction on only section 343. This was not legal error. While the two instructions together provide a more complete statement of the law, no case has explicitly required a court to issue both instructions. See Suriano, 117 Wn. App. at 831. The court's single instruction was not an incorrect or misleading statement of the law.

As part of its statement of the law, the given instruction included the element of the invitee's knowledge, allowing for liability only if Mobil "should expect that invitees will not discover or realize the danger, or will fail to protect themselves against it." Even without the section 343A instruction, Mobil had the opportunity to argue that Wright knew of the danger and knew to protect himself against it. Mobil touched on Wright's knowledge of the danger during closing arguments:

> Mr. Wright was not some invitee who came onto our facility and wandered into some dangerous condition that he wasn't prepared for or aware of. His company was hired to do this work.
> Based on all the precautions that were taken, they were prepared to do this work. The employer had that nondelegable duty and satisfied that duty in this case. Yet with all of that, Mobil is the one standing here having to defend itself against a claim that we failed to exercise ordinary care for this three-month job, 40 years ago.

Mobil was able to argue its theory of the case to the jury.

The business invitee instruction allowed Mobil to argue Wright's knowledge to the jury and was not incorrect or misleading. Therefore, the trial court's instruction was not erroneous. Additionally, because Mobil was able to argue its theory of the case, any error in the trial court's failure to provide the section 343A instruction was harmless. See Blaney v. Int'l Assoc. of Machinists & Aerospace Workers, Dist. No. 160, 151 Wn.2d 203, 211, 87 P.3d 757 (2005) ("An erroneous

9

jury instruction is harmless if it is 'not prejudicial to the substantial rights of the part[ies] . . ., and in no way affected the final outcome of the case.'") (alteration in original) (quoting State v. Britton, 27 Wn.2d 336, 341, 178 P.2d 341 (1947)).  The jury verdict stands based on premises liability.

### B. Contributory Negligence

Mobil claims the trial court erred by refusing to instruct the jury on the affirmative defense of contributory negligence.  Wright counters that Mobil failed to produce evidence in support of the instruction.

In order to prove contributory negligence, the defendant must show the plaintiff had a duty to exercise reasonable care for his own safety, failed to exercise such care, and the failure was a cause of the injuries.  Gorman v. Pierce County, 176 Wn. App. 63, 87, 307 P.3d 795 (2013).  The inquiry is whether or not the plaintiff exercised the care for his own safety that a reasonable person would have used under the existing facts and circumstances.  Dunnington v. Virginia Mason Med. Ctr, 187 Wn.2d 629, 637, 389 P.3d 498 (2017).

The evidence presented showed that Wright took all precautions known at the time to limit his exposure to asbestos.  As the corporate representative for Mobil noted, "Mr. Wright was the champion of wearing respirators," and he "not only wore one religiously himself" but also told other workers that they needed to wear one.  Wright also directed the employees to use water to wet down the insulation, which was a precaution to minimize asbestos dust.  However, the workers could not always use the wet method.  Brian Daley testified, "you couldn't do it all the times, you couldn't get the hose, you couldn't get the water to the areas

at all the times because there wasn't water in that unit." As Daley said, "the procedure we followed was to spray water to the best of everybody's ability and as much water as they had that was provided that we could get it on there."

Based on the testimony, Wright personally took the known precautions necessary to keep himself and his fellow workers safe. He wore the OSHA approved respirator and knew how to properly fit it. He and his coworkers used the wet method when possible. And, they bagged the insulation in plastic and deposited in a plastic lined dumpster for safe disposal of the asbestos containing material. Wright complied with the safety measures of the time period as a reasonable person would. Therefore, the trial court did not err in denying Mobil's request for a jury instruction on contributory negligence.

C. Assumption of Risk

Mobil argues it was entitled to a jury instruction on its affirmative defense of assumption of risk. Wright contends that Mobil did not provide evidence that Wright had more than generalized awareness of the risks of asbestos as required for an assumption of risk instruction.

To invoke assumption of risk, Mobil must show that Wright knowingly and voluntarily chose to encounter the risk. Egan v. Cauble, 92 Wn. App. 372, 377, 966 P.2d 362 (1998). This means that Wright, "(1) had full subjective understanding, (2) of the presence and nature of the specific risk, and (3) voluntarily chose to encounter that risk." Wagenblast v. Odessa Sch. Dist. No. 105-157-166J, 110 Wn.2d 845, 858, 758 P.2d 968 (1988). "A plaintiff has knowledge if, 'at the time of decision, [he or she] actually and subjectively knew all

facts that a reasonable person . . . in the plaintiff's shoes would want to know and consider.'" Reed-Jennings v. Baseball Club of Seattle, LP, 188 Wn. App. 320, 333, 351 P.3d 887 (2015) (alterations in original) (quoting Home v. N. Kitsap Sch. Dist., 92 Wn. App. 709, 720, 965 P.2d 1112 (1998)). Knowledge requires more than mere awareness of the generalized risk of the activities. Reed-Jennings, 188 Wn. App. at 333. There must be proof the plaintiff knew of and appreciated the specific hazard that caused the injury. Id.

Mobil failed to meet this burden. No testimony from Wright was available to show the extent of his knowledge of the risks inherent in removing asbestos-containing insulation. Daley testified that he and the other workers had been told that the material they were removing was asbestos. Wright knew to wear a respirator and advised the other workers to wear one when working with the insulation. He, and others, took precautions when removing the insulation to avoid breathing the asbestos dust. This is the extent of the information provided as to Wright's level of knowledge of the risks of removing the asbestos insulation. While Wright was clearly aware of the "generalized risk" of asbestos exposure, Mobil did not produce evidence that Wright knew the risk of exposure even with precautions or evidence that he knew the risk of developing mesothelioma. Given the minimal evidence on the extent of Wright's knowledge of the risks of performing his job, the trial court's decision against instructing the jury on assumption of risk was not an abuse of discretion.

II.  Hearsay Evidence

Mobil contends the trial court erred by admitting hearsay embedded within an ancient document.  We review admission of evidence for abuse of discretion. Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668, 230 P.3d 583 (2010).  Even if a trial court abuses its discretion in admitting evidence, the error is harmless where it is cumulative or of only minor significance in reference to the evidence as a whole.  Hoskins v. Reich, 142 Wn. App. 557, 570-71, 174 P.3d 1250 (2008).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  ER 801(c).  Statements in ancient documents, older than 20 years with established authenticity, are not excluded by the hearsay rule even if the declarant is available as a witness.  ER 803(a)(16).  After proper authentication as an ancient document, Washington courts have not examined the contents for hearsay.[3]  See Allen v. Asbestos Corp., 138 Wn. App. 564, 576-77, 157 P.3d 406 (2007) (finding collection of documents from Puget Sound Naval Shipyard admissible as an authenticated ancient document); Bowers v. Fibreboard Corp., 66 Wn. App. 454, 563-65, 832 P.2d 523 (1992) (finding dictionary of naval fighting ships was a compilation of data and admissible as an ancient document).

---

[3] But, federal courts interpreting the identical language of the Federal Rule of Evidence 803(16) have required examination of hearsay embedded within those documents.  See Langbord v. United States Dept. of Treasury, 832 F.3d 170, 190 (3rd Cir. 2016); United States. v. Hajda, 135 F.3d 439, 444 (7th Cir. 1998).

Here, the trial court allowed Wright to introduce a photocopy of a newspaper article entitled "Lung Cases Show Up at Mobil." The article was included in "OSHA Oversight Hearings on Proposed Rules on Hazards Identification" Hearings before the subcommittee on health and safety of the committee on education and labor for the House of Representatives in 1981. The article contains references to information about lung disease in confidential medical reports compiled by Mobil and statements by an unnamed medical expert. The court admitted the article, stating it qualified under ER 901(b)(8) as authentic for the purposes of the ancient document exception to hearsay.[4] The court did not undertake an examination of the contents for embedded hearsay. Nor did it need to since under ER 803(a)(16), any hearsay within the ancient document was admissible. Any arguments about the content would merely go to the weight to be given to the evidence by the jury.

Regardless of whether admission of the article was an abuse of discretion, any error was harmless. Wright introduced the article to contradict Mobil's claim that its refineries did not have excess cases of respiratory disease, lung cancer or mesothelioma. The article noted that a confidential Mobil study revealed 380 employees from the company's Paulsboro[5] refinery had lung damage associated with asbestos exposure, and 42 of those cases were serious. The article went on to say that an unnamed medical expert said that people with similar conditions have a 1-in-10 or 1-in-15 chance of contracting mesothelioma. In response to

---

[4] Mobil objected to authentication of the newspaper article through the Oversight Hearings record, stating "the mere fact that it's attached to this document does not authenticate it."

[5] Paulsboro is not the refinery at issue in this case.

questions about a passage in the article, the Mobil representative highlighted the unreliability of the article:

> [W]e don't know that medical expert, we don't know the dose that the person received, we don't know the time frame, we don't know that these people at Paulsboro, how long they worked there. They could have worked in a shipyard for 20 years before they got to Paulsboro. All of that is salient information on how to assess information like this."

Put in context of the trial, Wright used this ancient document to question Mobil's corporate representative and to briefly raise the issue of asbestos exposure at other Mobil locations during closing argument. This evidence was minimal and shown as unreliable by the Mobil representative. Moreover, the existence of asbestos at the Ferndale refinery was not a disputed issue. The main issue was the duty of care that Mobil owed Wright. Admission of the document was harmless.

III.   Expert Testimony

The trial court denied Mobil's motion to exclude the testimony of expert Industrial Hygienist Susan Raterman. Mobil contends the court erred because the testimony was speculative as to Wrights's potential range of exposure to asbestos. Wright argues the testimony was based on generally accepted principles in the field of industrial hygiene.

ER 702 governs the admission of expert testimony: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The expert's testimony must be based on fact rather than assumption. Coogan v. Borg-Warner Morse Tec Inc., 197 Wn.2d 790, 801,

490 P.3d 200 (2021). When courts have refused to admit expert testimony as speculative, the decision "hinge[d] on the expert's basis for forming the opinion, not on the expert's conclusions. When an expert fails to ground his or her opinions on facts in the record, courts have consistently found that the testimony is overly speculative and inadmissible." Volk v. DeMeerleer, 187 Wn.2d 241, 277, 386 P.3d 254 (2016). We review a decision on admission of expert testimony for abuse of discretion. Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wn.2d 654, 683, 15 P.3d 115 (2000).

According to Mobil, Raterman "ignored the undetectable amounts of asbestos measured at Ferndale during the time Mr. Wright worked there" and did not account for Wright's use of a mask for work with insulation. This mischaracterizes Raterman's testimony.

Raterman opined that Wright "was exposed to significant concentrations of asbestos . . . . They contributed to his cumulative asbestos exposure dose and increased his risk of developing mesothelioma." Raterman provided a range of exposure for Wright at the Mobil refinery. She determined an exposure range, rather than a specific amount, because "conditions change from day to day and work activities change from day to day." Raterman considered Wright's various work activities after reviewing the deposition testimony of Wright's coworkers at the refinery as to the tasks, protective equipment, and exposure controls they used. She reviewed documents from the refineries themselves, detailing the type of insulation, air samples, and exposure controls of the facilities. Raterman looked at asbestos specific literature published in the industrial hygiene field. And, she

considered the weather conditions of Wright's outdoor work at the refinery. She believed her opinions were based on a reasonable degree of scientific certainty.

During questioning by Mobil, Raterman stated that she did not use any of the air measurements taken at the Mobil Ferndale plant where Wright worked when she determined the exposure range. When asked whether using the data from Mobil Ferndale would be "more reliable and scientific," Raterman responded, "The most reliable and scientific method is to compare work activities. So the data from Mobil Ferndale was not presented in a way that differentiated what activities the individuals were actually performing when the data was collected." She explained that she used data from a different company and refinery because

> it provides the jury an example of dry removal exposure levels both in the breathing zone and at areas a distance from the actual breathing zone, for a bystander exposure. So it was important because it differentiated the work activities and the locations, whereas the Mobil Ferndale data, as a complete set, does not make a distinction between wet methods, dry methods, it doesn't make a distinction between the various different activities.

Additionally, the Ferndale air sample readings were taken around the perimeter of the refinery unit.[6] It was unclear how close the Ferndale measurements were to where the asbestos related work was being done. Based on these reasons, Raterman did not rely on the Ferndale data but compared the numbers to her exposure range and determined the Ferndale data "fell within the range" that she calculated from the literature and data about other sites.

---

[6] The Mobil corporate representative testified that Mobil could not perform personalized breathing zone samples for contractors because it was considered a medical procedure. Mobil could only perform area sampling.

Raterman also testified that she did not consider the use of masks or respirators in calculating Wright's exposure range. Raterman explained that "[t]he effectiveness of the respirators when worn by Mr. Wright was not tested and made available." She also noted that literature showed that masks or respirators would "likely hav[e] only been partially effective at completely preventing the inhalation of airborne asbestos during the 1940s to the 1980s due to improper seal or fit." And, she did not include the possible reduction of exposure due to masks, because OSHA directs "sampling in the breathing zone of employees or area samples without respect to the use of respirators to determine the amount of asbestos present" in order to facilitate the use of exposure controls. Raterman said that Wright's asbestos exposure could have been reduced by respiratory protection if his equipment was effective, but the commonly used masks had flaws that often allowed entry of contaminated air.

Raterman clearly explained the factual basis for her opinion, which was grounded in accepted research in the field of industrial hygiene. As to Mobil's claims that Raterman's testimony was speculative because she did not use the Ferndale sample data or consider a reduction in the range due to mask use, Raterman clearly explained her scientific reasons for her decision to exclude this information. Her expert testimony was not overly speculative. Mobil may disagree with Raterman's method of reaching her opinion. But, that goes to the weight of the evidence rather than its admissibility. See Lewis River Golf, Inc. v. O.M. Scott & Sons, 120 Wn.2d 712, 723, 845 P.2d 987 (1993) ("difference of opinion is the essence of conflicting opinions from experts," and where the expert explained the

opinion and method of calculation, defendant's disagreement with the opinion is with its weight rather than its admissibility). Therefore, the trial court did not abuse its discretion in admitting Raterman's expert testimony.

IV.    GR 37

During jury selection, Mobil attempted to exercise a peremptory challenge of juror 7. Wright objected to Mobil's use of the peremptory under GR 37. The court considered Wright's objection and then denied Mobil's peremptory challenge of juror 7. We review de novo a trial court's application of GR 37. State v. Omar, 12 Wn. App. 2d 747, 750-51, 460 P.3d 225, review denied, 196 Wn.2d 1016, 475 P.3d 164 (2020).

The purpose of GR 37 "is to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). A party may object to the use of a peremptory challenge on GR 37 grounds. GR 37(c). The trial court must then "evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances." GR 37(e). The court will consider factors such as the number and type of questions posed to the prospective juror as compared to others, use of peremptory challenges for similar answers to jurors not challenged, reasons disproportionately associated with race or ethnicity, and history of discriminatory peremptory challenges. GR 37(g). The court uses these factors to determine whether "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." GR 37(e). The applicable objective observer "is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors

19

in Washington." GR 37(f). If the court concludes that an objective observer could view race or ethnicity as a factor, the peremptory challenge is denied. GR 37(e). In its evaluation, "[t]he court need not find purposeful discrimination to deny the peremptory challenge." GR 37(e).

Juror 7 stated that her aunt had died of cancer and her uncle "just died from cancer." According to her, "one of them was dealing with lungs and one of them was my uncle, it was his throat." Juror 7 told the court she was "in the process of going to [sic] going through a civil case with someone, similar to this one." She clarified that her uncle was the plaintiff and she was "doing paperwork for him." When Mobil pressed for more details later, juror 7 said "I don't want to discuss it because the case is still going on. It's confidential. I would rather not speak about it, if you don't mind, Judge." The court responded, "That's fine." Mobil did not object or make a record of what it might have wanted to explore further about the lawsuit. Instead, it ceased questioning juror 7 about the lawsuit and moved on to other issues.

Mobil turned to the issue of juror 7's experience with cancer in the family: "We had talked a little bit about a number of people in your family who had had experience with cancer, as well. Do you believe that perhaps your sympathies with those individuals would affect how you viewed the issues in this case?" Juror 7 responded, "Ma'am, it's an emotional process that I'm still dealing with, because it just happened last year and this year. But, no, ma'am, it won't hinder or affect me from doing the case."

Mobil raised four issues to defend its use of a peremptory challenge on juror 7, who the court identified as one of four members of the venire who were likely African American. Mobil stated that juror 7 had "indicated that she is currently helping her uncle with an active lawsuit, he is the plaintiff" and declined to discuss the case further. When discussing cancer, juror 7 "was visibly upset. She was crying and she spoke about the effect of having lost family members to cancer." Juror 7 had a history of working as a caregiver. And, Mobil concluded by saying that juror 7 "appeared hostile" when answering questions.

In its analysis, the trial court expressed concern about the number of questions asked of juror 7 and that Mobil used "animus toward the defense" as a reason for its peremptory challenge. GR 37 identifies several reasons that "have historically been associated with improper discrimination in jury selection in Washington State," including that the prospective juror "exhibited a problematic attitude, body language, or demeanor." GR 37(i). A trial court should not accept these reasons "unless opposing counsel or the court itself can corroborate the allegations." Omar, 12 Wn. App. 2d at 752. Here, the trial court disagreed with Mobil that juror 7 was hostile, stating, "[N]othing that I observed or I heard gave me that particular concern." Mobil used a reason akin to a "problematic attitude," which "raise[d] a red flag" for the trial court.

Ultimately the trial court concluded that an objective observer aware of implicit bias could find race to be a factor in Mobil's use of the peremptory challenge to juror 7. Of key importance is the low threshold established by GR 37 that an objective observer could view race or ethnicity as a factor. GR 37(e). An

21

objective observer, aware of historical "implicit, institutional, and unconscious biases," would recognize Mobil's objection based on "hostility" as historically "associated with improper discrimination in jury selection" and could conclude that race was one factor in Mobil's exercise of its peremptory challenge. GR 37(f), (i).

"Even if the [defense]'s race-neutral justification was persuasive, under GR 37, a court's task is to determine whether an objective observer aware of implicit bias could view race or ethnicity as a factor." State v. Listoe, 15 Wn. App. 2d 308, 324, 475 P.3d 534 (2020). Mobil's inclusion of "problematic attitude," as a justification for the peremptory challenge would allow an objective observer to view race or ethnicity as a factor in asking to strike juror 7. Despite Mobil's other concerns, the trial court's denial of the peremptory challenge on GR 37 grounds was not an abuse of discretion.

V.   Settlement Agreements

Mobil argues that Wright and the parties he settled with violated the plain language of RCW 4.22.060 by refusing to provide their settlement agreements. Wright contends that Mobil received the settlement agreement of each defendant and all material terms of the settlement agreements.

RCW 4.22.060(1) requires settling parties to give all other parties five days' notice and a copy of the proposed agreement. The court then holds a hearing "on the issue of the reasonableness of the amount to be paid with all parties afforded an opportunity to present evidence." Id. The court determines whether the settlement is reasonable and reduces the amount of the claims against the remaining parties. RCW 4.22.060(2). The settling parties bear the burden of

establishing reasonableness. Sykes v. Singh, 5 Wn. App.2d 721, 727, 428 P.3d 1228 (2018). A determination of reasonableness is reviewed for abuse of discretion. Id.

Statutory interpretation is a question of law reviewed de novo. HomeStreet, Inc. v. Dept. of Revenue, 166 Wn.2d 444, 451, 210 P.3d 297 (2009). The primary objective of statutory construction is to ascertain and carry out the intent of the legislature. Id. When interpreting a statute, we look first to the plain language and end the inquiry if the plain language is subject to only one interpretation. Id.

By its plain terms, RCW 4.22.060(1) requires a settling party to provide the other parties and the court with a notice of settlement which "shall contain a copy of the proposed agreement." Here, the settling parties did not provide Mobil with the actual settlement agreements. Wright "verbally advised" Mobil of the amounts of the settlements with 3M, Texaco, Shell, and U.S. Oil. The settling parties provided declarations as to the amounts of the settlements. However, the parties did not provide "a copy of the proposed agreement" and therefore did not comport with the plain language of RCW 4.22.060.

Due to issues of confidentiality,[7] the court believed that it could assess the reasonableness of the settlements without introduction of the actual documents, "unless there's just something kind of wonky and unusual in the settlement

---

[7] RCW 4.22.060 does not contain an exception to full disclosure based on the parties' wish to keep any part of the agreement confidential. Wright has not cited any cases that have interpreted the statute to allow the parties to provide anything other than a copy of the settlement agreement. Wright also has not provided any case law holding that production to the trial court for in-camera review is authorized under RCW 4.22.060(1).

agreements."  The court ordered the parties to "meet and confer regarding the production of the settlement agreements to ExxonMobil under an agreed protective order."  The court subsequently signed and entered a stipulated protective order for the settlement agreements and accompanying documents.  Despite the protective order, the settling parties did not provide the full settlement agreements to either Mobil or the court.  Neither the trial court nor Mobil had the opportunity to examine the agreements for evidence of any "wonkiness."

The trial court failed to review and consider the entirety of the settlement agreements, focusing on only the bottom line numbers provided by the settling corporations.  Because the trial court did not review the full terms of the settlement agreement, the determination of reasonableness and the calculation of the set-off amount was an abuse of discretion.  A new reasonableness hearing is required.

We affirm the jury verdict, but vacate the judgment and remand for a new reasonableness hearing after full access to the settlement agreements.

_Appelwick, J._

WE CONCUR:

_Chun, J._                    _Verellen, J._

24